David M. Neff (AZ 032889)
Bradley A. Cosman (AZ 026223)
Kathleen M. Allare (IL 632536)
**PERKINS COIE LLP**
2901 North Central Avenue
Suite No. 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
DNeff@perkinscoie.com
BCosman@perkinscoie.com
KAllare@perkinscoie.com

*Counsel for Wilmington Trust, N.A., as Trustee for the benefit of the holders of COMM 2015-CCRE26 Mortgage Trust Commercial Mortgage Pass-Through Certificates*

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| WOODBRIDGE HOSPITALITY, L.L.C., | Case No. 2:21-bk-04096-PS |
| Debtor. | **MOTION TO PROHIBIT DEBTOR'S USE OF CASH COLLATERAL** |

Secured creditor Wilmington Trust, National Association, as Trustee, for the benefit of the holders of COMM 2015-CCRE26 Mortgage Trust Commercial Mortgage Pass-Through Certificates ("**Lender**"), hereby requests that the Court prohibit the use of its cash collateral by Woodbridge Hospitality, LLC ("**Debtor**"), and states as follows:

## INTRODUCTION

**I.    THE LOAN DOCUMENTS**

1. On or about July 2, 2015, Jeffries Loancore LLC ("**Original Lender**") made a loan ("**Loan**") in the original principal amount of $9,000,000 to Debtor. The Loan is evidenced in part by: (a) that certain *Loan Agreement* dated July 2, 2015 ("**Loan**

**Agreement**") between Debtor and Original Lender; and (b) that certain *Promissory Note* dated July 2, 2015 ("**Note**"), in the original principal amount of $9,000,000 executed by Debtor, in favor of Original Lender. True and correct copies of the Loan Agreement and the Note are attached hereto as Exhibit A and Exhibit B, respectively. The collateral for the Loan is the property located at 9880 N. Scottsdale Road in Scottsdale, Arizona, formerly known as the Homewood Suites by Hilton hotel and the Suites on Scottsdale ("**Property**").

2. The Loan is secured by, among other things, that certain *Deed of Trust, Assignment of Leases and Rents and Security Agreement* dated July 2, 2015 ("**Deed of Trust**") executed by Debtor, as grantor, in favor of Original Lender, which was recorded in the Official Records of Maricopa County, Arizona ("**Official Records**") on July 2, 2015, as Instrument No. 20150480439, that certain *Assignment of Leases and Rents* executed by Debtor in favor of Original Lender, which was recorded in the Official Records on July 2, 2015, as Instrument No. 20150480440, and that certain UCC Financing Statement (as amended and continued). True and correct copies of the Deed of Trust, Assignment of Leases and Rents and UCC Financing Statement (as amended and continued) are attached hereto as Exhibits C, D and E respectively.

3. The Deed of Trust and Assignment of Leases and Rents, among other things, encumber the Property and, as more particularly described therein, absolutely assign to Lender the Leases and Rents (each as defined in the Deed of Trust) pertaining to the Property. [Ex. C, § 2; Ex. D § 2] The Loan Agreement, the Note, the Deed of Trust, the Assignment of Leases and Rents and all the other documents that evidence, secure, or relate to the Loan are hereinafter referred to, collectively, as the "**Loan Documents**."

4. In connection with the Loan, Sukhbinder Singh Khangura and Jasbir Singh Khangura executed a *Guaranty of Recourse Obligations* dated July 2, 2015 ("**Guaranty**") guaranteeing full, prompt and complete payment of certain Guaranteed Obligations relating to the Loan as stated in the Guaranty.

## II. THE ASSIGNMENT OF THE LOAN DOCUMENTS TO LENDER

5. On or about October 8, 2015, Original Lender assigned its interest in the Loan Agreement, the Note, the Deed of Trust, the Assignment of Leases and Rents and all other Loan Documents to Wilmington Trust, National Association, as Trustee, for the benefit of the holders of COMM 2015-CCRE26 Mortgage Trust Commercial Mortgage Pass-Through Certificates via: (i) that certain *General Assignment* dated October 8, 2015 and (ii) that certain *Assignment of Deed of Trust, Assignment of Leases and Rents and Security Agreement* dated October 8, 2015, and (iii) that certain *Assignment of Assignment of Leases and Rents* dated October 8, 2015. True and correct copies of these documents are attached hereto as Exhibits F, G and H, respectively.

6. Accordingly, Lender holds all of Original Lender's interest in the Loan and the Loan Documents, and is the owner under the Loan Agreement, the holder of the Note, the beneficiary of the Deed of Trust, the assignee under the Assignment of Leases and Rents, and the owner and holder of all of the other Loan Documents.

## III. DEBTOR'S OBLIGATIONS

7. Pursuant to Article 1 of the Note, Debtor promised, among other things, to pay to Lender sums under the Note at the rates and at the times specified in the Loan Agreement, and all accrued and unpaid interest thereon and all other amounts due on the Maturity Date. Pursuant to Section 2.2 of the Loan Agreement, Debtor promised, among other things, to pay monthly installments of $47,792.76 in principal and interest on the sixth day of each month beginning August 6, 2015 and ending July 6, 2025, with the remaining amounts to be paid on the Maturity Date of July 6, 2025. [Ex. B, § 2.2.1]

8. Pursuant to Section 8.1(a) of the Loan Agreement, among other things, (1) failure to pay any portion of the debt when due under the Loan Agreement, or (2) failure to make any payment required under Sections 3.3 (Taxes & Insurance), 3.4 (Capital/FF&E Reserve), 3.5 (Seasonal Working Capital Reserve), 3.6 (Operating Expense Subaccount), 3.7 (Casualty/Condemnation Subaccount), 3.9 (Cash Collateral Subaccount) or 3.12 (PIP

Reserve Subaccount) of the Loan Agreement when due, is an "Event of Default." [Ex. A § 8.1(a)]

9. Also, pursuant to Section 8.1 of the Loan Agreement, it is an "Event of Default" if Debtor breaches any covenant contained in Section 5.22 (prohibiting Debtor from incurring any other indebtedness, with some limited exceptions), Section 5.27 (prohibiting Debtor from incurring or suffering to exist any lien on all or any portion of the property or its ownership interest, with some limited exceptions), or Section 5.33 (requiring Debtor to maintain and comply with its Franchise Agreement with Hilton Hotels, and prohibiting Debtor from suffering or permitting any default under the Franchise Agreement that would allow Hilton to terminate or cancel the Franchise Agreement). [Ex. A §§ 8.1(h), 8.1(*l*)]

10. Under § 2.2.2 of the Loan Agreement, upon the occurrence of and during the continuance of an Event of Default, the entire unpaid balance of the Loan bears interest at the default rate, which is 9.905% (or 5% above otherwise applicable Interest Rate) (the "**Default Rate**"). [Ex. A §§ 2.2.2 and 1.1]

11. Pursuant to Section 2(a) of the Deed of Trust, Debtor unconditionally assigned to Lender all right, title and interest in all Rents from the Property, and Lender granted a revocable license to Debtor to collect and retain the Rents from the Property subject to the requirements of the Loan Agreement, but upon any Event of Default that license is automatically revoked. [*See* Ex. C, § 2(a)] Pursuant to Section 2 of the Assignment of Leases and Rents, Debtor unconditionally assigned to Lender all right, title and interest in all Rents from the Property, and Lender granted a revocable license to Debtor to collect the Rents from the Property subject to and in compliance with the requirements in the Loan Documents, but upon any Event of Default that license is automatically revoked. [Ex. D. § 2]

12. In Section 5.15 of the Loan Agreement titled "Change in Business or Operation of Property," Debtor covenanted and agreed with Lender that:

> **Debtor shall not** . . . make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise **cease to operate the Property as a hotel property** or terminate such business for any reason whatsoever (other than temporary cessation in connection with renovations to the Property).

[Ex. A § 5.15] (emphasis added). Under Section 8.1(h) of the Loan Agreement, a breach of Section 5.15 is an immediate Event of Default.

13. In Section 5.34 of the Loan Agreement titled "Hotel Operation," Debtor covenanted and agreed with Lender that:

> . . . **Debtor shall: (i) cause the hotel located on the Property to be operated, repaired and maintained as a well-maintained "first-class hotel"** which shall mean a hotel providing amenities, services and facilities substantially equivalent or superior to hotels of similar average room rate and targeted market segment from time to time operating in the same or comparable geographic area of the Property, taking into consideration the age and location of the hotel located on the Property . . . .

[Ex. A § 5.34] (emphasis added). Under Section 8.1(*l*) of the Loan Agreement, a breach of Section 5.34 is an immediate Event of Default.

14. In Section 5.32 of the Loan Agreement titled "Approval of Major Contracts," Debtor covenanted and agreed with Lender that, "Debtor shall not, without Lender's prior consent: (a) enter into . . . any Major Contract to which it is a party or to which Debtor or the Property is subject," and the Loan Agreement defines "Major Contract," in part, as "any . . . contract or agreement of any kind (other than Leases) of a material nature . . . relating to the ownership, leasing, management, use, operation, maintenance, repair or restoration of the Property." [Ex. A §§ 5.32 & 1.1].

## IV. DEBTOR'S MULTIPLE AND MATERIAL BREACHES UNDER THE LOAN DOCUMENTS

15. Section 8.1 of the Loan Agreement outlines the conduct that constitutes an Event of Default under the Loan Documents. Among other things, an Event of Default occurs if "any portion of the Debt is not paid when due or Debtor shall fail to pay when due

any payment required under Sections 3.3, 3.4, 3.5, 3.6, 3.7, 3.9 or 3.12 hereof," if "any of the Taxes are not paid when due," if "Debtor breaches any covenant contained in Section 5.12.1(a)-(f), 5.13, 5.15, 5.22, 5.25, 5.27 or 5.28," if "Debtor breaches any covenant contained in Section 5.33 or Section 5.34," or if Debtor breaches or defaults under any other provision in any of the Loan Documents and fails to cure. [Ex. A § 8.1(a), 8.1(b), 8.1(h), 8.1(k), 8.1(*l*), 8.1(m)].

16. Debtor failed to pay the Monthly Debt Service Payment Amount due on the monthly Payment Dates designated in the Loan Agreement from May 2020 up to and including April 2021 in the aggregate amount of at least $573,513.12; accordingly, Debtor breached the covenants outlined, *inter alia*, in Sections 2.2.1(b) and 8.1(a) of the Loan Agreement causing an Event of Default.

17. Debtor failed to pay the required deposits into the Tax and Insurance Subaccount on account of Taxes due on the Payment Dates designated in the Loan Agreement from May 2020 up to and including April 2021 in the aggregate amount of at least $117,292.72; accordingly, Debtor breached the covenants outlined, *inter alia*, in Sections 3.3 and 8.1(a) of the Loan Agreement causing an Event of Default.

18. Debtor failed to pay the required deposits into the Tax and Insurance Subaccount on account of Insurance Premiums due on the Payment Dates designated in the Loan Agreement from May 2020 up to and including April 2021 in the aggregate amount of at least $51,483.58; accordingly, Debtor breached the covenants outlined, *inter alia*, in Sections 3.3 and 8.1(a) of the Loan Agreement causing an Event of Default.

19. Debtor failed to pay the required deposits into the Capital/FF&E Reserve Subaccount due on the Payment Dates designated in the Loan Agreement from May 2020 up to and including April 2021 in the aggregate amount of at least $165,096.00; accordingly, Debtor breached the covenants outlined, *inter alia*, in Sections 3.4 and 8.1(a) of the Loan Agreement causing an Event of Default.

20. Debtor failed to pay the required deposits into the Seasonal Working Capital Reserve Subaccount due on the Payment Dates designated in the Loan Agreement from

October 2020 up to and including April 2021 in the aggregate amount of at least $269,780.00; accordingly, Debtor breached the covenants outlined, *inter alia*, in Sections 3.5 and 8.1(a) of the Loan Agreement causing an Event of Default.

21. Debtor incurred junior-secured debt against the Property with Maxim Commercial Capital, LLC; accordingly, Debtor breached the covenants outlined, *inter alia*, in Sections 5.22, 5.27 and 8.1(h) of the Loan Agreement causing an Event of Default. Debtor also incurred junior-secured debt against the Property through an EIDL loan with the SBA; accordingly, Debtor breached the covenants outlined, *inter alia*, in Sections 5.22 and 8.1(h) of the Loan Agreement causing an Event of Default. In addition, Debtor incurred debt through PPP loans or funds; accordingly, Debtor breached the covenants outlined, *inter alia*, in Sections 5.22 and 8.1(h) of the Loan Agreement causing an Event of Default.

22. Debtor's conduct, actions and inactions caused a default under the Hilton Franchise Agreement and as a result Hilton terminated or canceled the Franchise Agreement for the Property around the end of 2020; accordingly, Debtor breached the covenants outlined, *inter alia*, in Sections 5.33 and 8.1(*l*) of the Loan Agreement causing an Event of Default.

23. Debtor failed to pay Arizona Department of Revenue ("**AZDOR**") sales taxes when due for the operations at the Property causing AZDOR to file a proof of claim in this case in the amount of $1,065,747.75; accordingly, Debtor breached the covenants outlined, *inter alia*, in Sections 8.1(b), 5.2, 8.1(j), 8.1(k) and 8.1(m) of the Loan Agreement causing an Event of Default.

24. On July 24, 2020, Lender's counsel delivered a letter to Debtor (the "**Demand Letter**") that: (i) provided formal notice to Debtor of certain of its defaults under the Loan Documents; (ii) informed Debtor that the Loan had been accelerated and all amounts due under the Loan Documents were due and payable and bearing interest at the Default Rate; and (iii) reserved Lender's right to exercise its remedies under the Loan Documents. A copy of the Demand Letter is attached hereto as Exhibit I.

## V. DEBTOR'S BREACHES RELATING TO ITS RECENT SUBCONTRACT WITH ICE/DHS TO USE THE PROPERTY AS AN IMMIGRATION DETENTION CENTER

25. On or about May 13, 2021, Debtor signed a *Subcontract Agreement in Support of Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE) Emergency Family Staging Centers (EFCS)* (the "**ICE/DHS Contract**"). A copy of the ICE/DHS Contract obtained from Debtor is attached hereto as Exhibit J.

26. Debtor did not inform Lender of its intention to enter into the ICE/DHS Contract before it was executed and did not obtain Lender's prior consent to enter into the ICE/DHS Contract. Debtor first provided Lender with a copy of the ICE/DHS Contract on May 15, 2021, after it had already been fully executed.

27. The ICE/DHS Contract provides that Debtor's hotel facility will cease being operated as a hotel, and will instead be operated as an ICE/DHS detention center for immigrant families being held in ICE custody who are awaiting deportation, continued custody, or release determinations by ICE, DHS or the Department of Justice. The ICE/DHS Contract states that its "period of performance" will be from May 23, 2021 through September 30, 2021, and possibly longer. [Ex. J at 1].

28. The ICE/DHS Contract states that the hotel property will be used to provide "up to 1,200" ICE detainees with bed space, meal services, medical screening, human trafficking screening, meetings with attorneys, child care, health and hygiene orientation, other services "**twenty-four (24) hours per day, seven (7) days per week.**". [Ex. J at 60-69, § 2, § 5(a)(v), (ix), § 5(b)(i), (iv)-(xiv)] (emphasis added).

29. The ICE/DHS Contract leaves no doubt that the hotel facility will be repurposed as an ICE detention center, securing and holding all of the individuals who stay there in government custody at all times, day and night. For example, the ICE/DHS Contract states that "[a]ll residents will be in the legal custody of ICE, therefore they can only be released at the direction of ICE" (*id.* at 60, § 2), and "[a]t all times, individuals comprising family units shall remain in the legal custody of ICE, irrespective of residential

-8-

Case 2:21-bk-04096-BKM    Doc 29    Filed 06/03/21    Entered 06/03/21 18:47:08    Desc
152651284.5                         Main Document    Page 8 of 14

services provided by Service Provider." *Id.* at 62, § 5(a)(iii), (xi). The ICE/DHS Contract also requires that those providing services at the facility "shall structure all programs and implement strategies designed to ensure residents remain within the residential setting to include, if necessary, consequences for departing without authorization." *Id.* at 62, § 5(a)(xi).

30. Debtor's performance of the ICE/DHS Contract would be a breach of Debtor's covenants in Section 5.15 of the Loan Agreement, including without limitation that:

> "Debtor shall not. . . make any material change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business or otherwise cease to operate the Property as a hotel property or terminate such business for any reason whatsoever."

31. Debtor's performance of the ICE/DHS Contract would also be a breach of Debtor's covenants in Section 5.34 of the Loan Agreement, including without limitation that:

> "Debtor shall: (i) cause the hotel located on the Property to be operated, repaired and maintained as a well-maintained 'first-class hotel.'"

32. Debtor's performance of the ICE/DHS Contract would also be a breach of Debtor's agreements in Section 3 of the Deed of Trust, including without limitation that Debtor "shall not (i) change the use of the Trust Property."

33. The ICE/DHS contract is a Major Contract as defined in Section 1.1 of the Loan Agreement because it is a "contract or agreement of any kind (other than Leases) of a material nature . . . relating to the ownership, leasing, management, use, operation, maintenance, repair or restoration of the Property." Because it is a Major Contract, Debtor's entry into the ICE/DHS Contract without Lender's prior consent was a breach of its covenants in Section 5.32 of the Loan Agreement, including without limitation that "Debtor

shall not, without Lender's prior consent: (a) enter into . . . any Major Contract to which it is a party or to which Debtor or the Property is subject."

## VI. RECEIVERSHIP LITIGATION

34. On April 23, 2021 Lender filed a *Complaint* seeking the appointment of a receiver for the Property based on Debtor's breach of the Loan Documents up to that date. A few days later on April 26, 2021, Lender filed an application for an *Order to Show Cause* and an *Application for the Appointment of a Receiver*. When these documents were filed, Lender did not know that Debtor was about to sign the ICE/DHS Contract, which Debtor first provided to Lender on May 15, 2021, after it had already signed it.

35. At the return hearing on May 21, 2021, the state court set an evidentiary and substantive hearing on the application to appoint a receiver for June 9, 2021. Counsel for Lender expressed concern that the ICE/DHS Contract states that it will begin to be performed as early as May 23, 2021 (well before the June 9 evidentiary hearing), and objected to allowing any performance of the ICE/DHS Contract to begin because that would convert the Property from a hotel into an ICE immigrant detention facility in direct violation of the Loan Documents. In response to that concern, the state court invited Lender to file a motion for a TRO to maintain the status quo operation of the Property pending the resolution of the underlying contract and receivership issues. Shortly after the return hearing, Lender's counsel informed Debtor's counsel that Lender would be filing an application for a TRO.

36. On May 24, 2021, Lender filed a *Verified First Amended Complaint* addressing the new issues related to the ICE/DHS Contract, and concurrently filed an *Application for a TRO* to prevent Debtor and its agents from moving forward with any performance of the ICE/DHS Contract and to maintain the Property's operation as a first-class hotel pending resolution of these issues at the June 9 hearing or thereafter.

## VII. DEBTOR'S BANKRUPTCY

37. On May 26, 2021, one hour before the hearing on the TRO, Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code, staying the state court

litigation. On May 27, 2021, Lender filed a *Notice of Non-Consent of Use of Cash Collateral* with this Court.

38. As of this date, June 1, 2021, Debtor still has not filed a motion to use cash collateral.

## ARGUMENT

39. Under section 363(c)(1), Debtor cannot use cash collateral absent Lender's consent or Court approval. As Lender does not consent to use of its cash collateral, the Court can only authorize it if Debtor provides Lender with adequate protection. 11 U.S.C. § 363(e). Under section 361, adequate protection can consist of cash payments or an additional or replacement lien to Lender to compensate it for the decrease in value of its collateral or the granting of other relief (other than an administrative expense) that will allow Lender to realize the indubitable equivalence of its interest in its collateral.

40. Debtor has the burden of proving by a preponderance of the evidence that Lender is adequately protected in order to use Lender's cash collateral. 11 U.S.C. § 363(p); *In re McCombs Properties VI, Ltd.*, 88 B.R. 261, 268 (Bankr. C.D. Cal. 1988). While "adequate protection" is not defined in the Bankruptcy Code, Section 361 recognizes that, to the extent that use of cash collateral "results in a decrease in the value of such entity's interest in such property," adequate protection may consist of cash payments or replacement liens. 11 U.S.C. § 361(1), (2); *see also In re Las Vegas Monorail Co.*, 429 B.R. 317, 326 (Bankr. D. Nev. 2010). In addition, the estate may provide other forms of adequate protection so long as they "will result in the realization by [the secured party] of the indubitable equivalent of such entity's interest in such property." 11 U.S.C. § 361(3).

41. As noted by the Ninth Circuit's Bankruptcy Appellate Panel, "'[t]here is an inherent tension between a debtor's need to use its cash to continue operating and a secured creditor's right to preserve its security interest in the debtor's cash proceeds.'" *Security Leasing Partners, LP v. ProAlert, LLC (In re ProAlert, LLC)*, 314 B.R. 436, 441 (9th Cir. BAP 2004) (quoting Stephen A. Stripp, Balancing the Interests in Orders Authorizing the Use of Cash Collateral in Chapter 11, 21 Seton Hall L.Rev. 562, 565–66 (1991)). Generally,

-11-

Case 2:21-bk-04096-BKM    Doc 29    Filed 06/03/21    Entered 06/03/21 18:47:08    Desc
152651284.5                    Main Document        Page 11 of 14

adequate protection is intended to ensure that the secured creditor ultimately receives what it would have received absent bankruptcy intervention. *In re Las Vegas Monorail Co.*, 429 B.R. 317, 326–327 (Bankr. D. Nev. 2010). "'Although stripped of the right to immediate possession of its property, the creditor receives assurances that the value it could have received through foreclosure will not decline.'" *In re ProAlert*, 314 B.R. at 441–42 (quoting 3 James F. Queenan, *327 Jr. et. al, Chapter 11 Theory and Practice § 16.03 (1994)).

42. At the outset, there is no issue that the revenue received from the ICE Contract constitute Lender's cash collateral. "Rents" is broadly defined term in both the Deed of Trust and UCC Financing Statement to encompass any income derived from use of the Property, from whatever source. [Ex. A § 2(a), Ex. E]. Thus, Debtor must show that Lender is adequately protected by the use of its collateral to allow Debtor to perform under the ICE Contract.

43. Debtor cannot show that Lender is adequately protected by use of its cash collateral to utilize the hotel facility as an immigration detention center and not as a hotel, as it is required to do under the Loan Documents. Converting what was once a Homewood Suites by Hilton hotel in an upscale and heavily trafficked area of Scottsdale abutting Paradise Valley (Scottsdale Road and Mountain View Road) into an ICE detention center will result in irreparable damage to reputation, lost business goodwill, and loss of future business opportunities for the facility as a hotel. This hotel property will be known as the place used as the ICE detention center and will lose its ability to compete effectively as an upscale hotel option in the crowded Scottsdale market. The use of the Property in this area as an ICE detention facility is also likely to generate significant public controversy and negative publicity for the hotel from which it may never recover.[1]

44. These conclusions are supported by the declaration of David Sherf (attached hereto as <u>Exhibit K</u>). Mr. Sherf, a leading hotel industry expert whose office is in

---

[1] Indeed, the local press has already picked up on the issue and protests have occurred outside the facility and along Scottsdale Road.

-12-

Case 2:21-bk-04096-BKM    Doc 29    Filed 06/03/21    Entered 06/03/21 18:47:08    Desc
152651284.5              Main Document    Page 12 of 14

Scottsdale, was directly involved in the initial construction of this hotel, and previously served on the Paradise Valley Town Council for six years from 2013 to 2018 and was Vice Mayor in 2016. Mr. Sherf's declaration confirms that Debtor's proposed conversion of the hotel to a around-the-clock detention center would cause irreparable damage to the physical condition, reputation, and value of the Property, and thus to Lender.

45. The harm to Lender by the facility's use as an ICE detention facility is also confirmed in the declaration of David Buddemeyer (attached hereto as <u>Exhibit L</u>). Mr. Buddemeyer is Principal and President of Driftwood Hospitality Management, which manages almost 70 hotels throughout the company, including several in the Phoenix area. Lender had proposed Mr. Buddemeyer as receiver for the Property. Mr. Buddemeyer confirms the harsh physical treatment the Property is likely to suffer from the individuals and families to be detained inside its walls. Again, that is harm to be suffered by Lender's collateral, for which there is no proposed adequate protection.

46. Finally, Lender is unaware of any additional collateral Debtor can offer as adequate protection and use of the Property as an ICE detention facility is not the indubitable equivalence of operating the Property as a hotel, as required by the Loan Documents. Indeed, there is an end date to the ICE Contract, after which the use of the Property is unknown. Lender expects Debtor to claim it will sell the Property and the buyer will change its use to multi-family. However, there is no sale of the property in the immediate future. Debtor has been claiming a sale closing is just around the corner since last year. The sale contract is dated December 8, 2020 and contains various contingencies, including the change in the Property's zoning. Debtor originally informed Lender a sale would close by February, then it was May, then it was September and now it is November. <u>See</u> Declaration of David Smith, attached hereto as <u>Exhibit M</u>. Indeed, it is apparent the prospective buyer has not obtained the zoning changes it needs from the City of Scottsdale to move forward with the purchase. Lender should not suffer the abuse of its collateral in

the meantime to satisfy Debtor's equity owners' pipe dream of realizing a windfall on this speculative sale.[2]

47. In the absence of an offer by Debtor and solid proof of adequate protection to Lender to compensate it for the substantial loss in value of its collateral by its conversion from a hotel to an ICE detention facility for at least four months, the Court cannot permit Debtor to use cash collateral.

## CONCLUSION

For the foregoing reasons, the Court should deny Debtor's request to use Lender's cash collateral.

Dated: June 3, 2021

**PERKINS COIE LLP**

By: /s/ David M. Neff
David M. Neff (AZ 032889)
Bradley A. Cosman (AZ 026223)
Kathleen A. Allare (IL 6326536)

*Attorneys for Lender*

---

[2] These are the same Owners who racked up more than $1 million in unpaid sales taxes (and incurred more than $1.5 million in unpaid sales taxes in the Crestwood case), obtained EIDL loan proceeds in or around June 2020 and thereafter made no payments on the Loan and in March 2021 obtained hundreds of thousands of dollars in PPP loan proceeds even though the Property was operating with a skeleton staff and the Owners likely used the proceeds for non-payroll purposes, further increasing claims against the estate.