Randy Nussbaum (SBN 006417)
Randy.Nussbaum@SacksTierney.com
Philip R. Rudd (SBN 014026)
Philip.Rudd@SacksTierney.com
Sierra M. Minder (SBN 035795)
Sierra.Minder@SacksTierney.com
**SACKS TIERNEY P.A.**
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ 85251-3693
Telephone: 480.425.2600
Facsimile: 480.970.4610
*Proposed Attorneys for Debtor*

## IN THE UNITED STATES BANKRUPTCY COURT

## THE DISTRICT OF ARIZONA

| In re: | Chapter 11 Proceedings |
|---|---|
| WOODBRIDGE HOSPITALITY, L.L.C., | Case No.2:21-bk-04096-PS |
| Debtor. | **DECLARATION OF SUKHBINDER KHANGURA** |

I, Sukhbinder Khangura, hereby declare under penalty of perjury of the laws of the United States of America, as follows:

1.  I am an adult resident of Maricopa County, Arizona.

2.  I am the manager of Woodbridge Hospitality, LLC ("Debtor"), as debtor and debtor-in-possession in the above-captioned bankruptcy case.

3.  I am authorized and competent to make this declaration in support of the various "first day" motions filed by the Debtor in the above-captioned case..

4.  The statements contained herein are accurate to the best of my knowledge and, unless otherwise indicated, are based upon my personal knowledge and/or knowledge that I

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

have gained from my review of the Debtor's books and records that are kept in the ordinary course of business and my communications with the Debtor's employees and managers who obtain their information from the Debtor's books and records. Any legal conclusions contained herein are made based upon my understanding of the law and pertinent circumstances.

5. I have read and am familiar with the motions filed by the Debtor and their respective contents.

**The Debtor**

6. The Debtor is an Arizona limited liability company formed in December 2002.

7. The Debtor's members are the Sukhbinder & Rupinder Khangura Family Revocable Trust dated May 19, 2008 (the "Suky & Rupi Trust") and the Jasbir Khangura Revocable Trust dated July 13, 2013 (the "Jas Trust") (collectively, the "Owners").

8. The beneficiaries of the Suky & Rupi Trust are me and Rupinder Khangura ("Rupi"), and the beneficiary of the Jas Trust is Jasbir Khangura ("Jas").

9. On May 26, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Arizona.

10. The Debtor is authorized to operate its business as debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.[1]

**The Debtor's Property**

11. The Debtor owns the Suites on Scottsdale hotel located generally at 9880 North Scottsdale Road in Scottsdale, Arizona (the "Hotel").

12. As discussed below, Ledgestone has been managing and operating the Hotel for the Debtor since January 2019.

13. The Debtor acquired the Hotel in February 2003 and, until December 30, 2020,

---

[1] Unless otherwise indicated, references to statutory sections herein shall be to the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

operated the Hotel as a Homewood Suites by Hilton pursuant to a Franchise License Agreement with Promus Hotels, Inc., a subsidiary of Hilton Hotels Corporation ("HHC"), dated February 14, 2003 (the "Franchise Agreement").

14. The Franchise Agreement, which was set to expire in February 2023 by its own terms, was terminated by HHC on December 30, 2020.

15. Prior to the termination of the Franchise Agreement in late December 2020, the Debtor did not fully perform all of the "property improvement program" ("PIP") requirements under the HHC Franchise Agreement and, therefore, did not pass several HHC "Quality Assurance" inspections.

16. Even though the Debtor proposed to pay between $6 million and $10 million to improve the Hotel and satisfy the PIP requirements, HHC indicated to the Debtor that it was not interested in extending the Franchise Agreement beyond its expiration in February 2023. Consequently, the Debtor chose not to expend the capital to make the PIP improvements.

17. Therefore, HHC terminated the Franchise Agreement effective December 30, 2020.

18. The Hotel has 114 guest suites, of which approximately 95 are currently configured for guests (the rest are used as office and/or storage space) with a total of approximately 151 beds, two corporate meeting rooms, a business center, an outdoor pool, a fitness center, and other guest amenities, including a breakfast kitchen area.

19. As of the Petition Date, the Debtor had twelve employees, although the number of employees fluctuates with the seasons and general employee attrition.

20. As discussed below, the number of employees will likely be increased upon implementation of the Endeavors Contract.

21. Historically, the Debtor operated profitably. In fact, in 2019, under Ledgestone's management, the Debtor had revenues of approximately $3,831,000 and $819,203 in annual profit (after interest).

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

22. Like many industries, the hospitality industry in general, and the Hotel specifically, were significantly adversely affected by the global COVID-19 pandemic, and the Debtor's operations and revenues suffered greatly in 2020. In fact, the Debtor's revenues declined by approximately 69% in 2020.

23. As discussed below, on December 8, 2020, the Debtor entered into a *Purchase and Sale Agreement* ("PSA") providing for the sale of the Hotel to SRE, who intends to convert the Hotel to apartments.

24. Between December 30, 2020 and approximately May 22, 2021, the Debtor operated the Hotel as an independent hotel.

25. As discussed below, on May 13, 2021, the Debtor entered into that certain *Subcontract Agreement in Support of Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE) Emergency Family Staging Centers (EFCS)* (together with that certain *Modification of Subcontract Agreement (Modification 01)* dated May 28, 2021 (the "Modification"), the "Endeavors Contract")) with Family Endeavors, Inc., a Texas non-profit corporation d/b/a San Antonio Family Endeavors ("Endeavors"), which provides for the operation of the Hotel as a temporary shelter and emergency family staging center for non-citizen families under the supervision of the Department of Homeland Security, Immigration and Customs Enforcement (the "Government").

26. Endeavors began housing families at the Hotel on or about May 28, 2021.

**The Debtor's Debt**

**Wilmington Trust**

27. The Hotel is encumbered by an asserted first position deed of trust in favor of Wilmington Trust, National Association, as Trustee, for the benefit of the holders of COMM 2015-CCRE26 Mortgage Trust Commercial Mortgage Pass-Through Certificates (the "Lender"), by and through CWCapital Asset Management LLC, special servicer for the Lender.

28. The Lender asserts that, as of April 12, 2021, the total outstanding balance due

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

to the Lender on the loan allegedly secured by the Hotel (the "Loan") was $9,266,269.45.

29.     The Debtor disputes the amount alleged to be due to the Lender.

30.     Additionally, upon information and belief and according to the Debtors' records, through April 2021, the Lender held approximately $1.469 million in reserve funds supplied by the Debtor, as follows:

| | | |
|---|---|---|
| Seasonality Reserve | $ | 235,001.07 |
| FF&E Replacement Reserve | $ | 784,812.10 |
| PIP Reserve | $ | 450,020.32 |
| **TOTAL RESERVE** | **$1,469,833.49** | |

31.     When the Debtor's revenues declined in 2020, the Debtor fell behind in its payments to the Lender, and the Lender accelerated the Loan.

32.     The Lender asserts that the Debtor is in default under the Loan for, among other things, the Debtor's failure to make payments the Lender.

33.     Despite the existence of an equity cushion of approximately 88% (*i.e.* a value of approximately $8.2 million **over and above** the asserted amount of the Loan), prior to the Petition Date, the Lender initiated an action in the Maricopa County Superior Court ("State Court") seeking the appointment of a receiver over the Hotel and the issuance of a temporary restraining order ("TRO") to prevent the Debtor's use of the Hotel pursuant to the terms of the Endeavors Contract (the "State Court Action").

34.     Additionally, the Lender noticed a Trustee's Sale of the Hotel for July 27, 2021.

35.     The State Court set an evidentiary hearing regarding the TRO for May 26, 2021 at 1:30 p.m., and an evidentiary hearing regarding the Lender's request for the appointment of a receiver for June 9, 2021 at 1:30 p.m.

36.     To avoid the costs associated with defending the State Court Action, to prevent the Trustee's Sale of the Hotel, and to prevent the loss of approximately $8.2 million in value that can and will be used to, among other things, pay other financial obligations of the Debtor, the Debtor filed its bankruptcy petition on the Petition Date.

**ADOR—Delinquent TPT Taxes**

37.     In 2017 and 2018, the previous management company that operated the Hotel

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

for the Debtor, American Hospitality Inc. ("AHI"), failed to file returns for, and to pay, Arizona State transaction privilege taxes ("TPT") for the Debtor, resulting in a tax liability to the State of Arizona in excess of $1.2 million.

38.     In February 2019, after discovering AHI's unauthorized failure to file TPT returns and pay the TPT taxes, the Debtor removed AHI as its hotel manager, and retained Ledgestone to manage the Hotel. Ledgestone continues to manage the Hotel and has timely filed returns for, and paid, all Arizona State (and other local) TPT and other taxes.

39.     In 2019, the Debtor (with Ledgestone's assistance) entered into an agreement with the Arizona Department of Revenue ("ADOR") to make payments to ADOR of $45,000 per month to reduce the delinquent TPT taxes.

40.     Pursuant to a global workout with ADOR involving the Debtor and an affiliated entity, these payments to ADOR were reduced to $22,500 per month.

41.     Upon the onset of the COVID-19 pandemic, the Debtor and ADOR agreed to reduce the monthly payments on the delinquent TPT taxes to $4,000 per month.  As of the Petition Date, the Debtor was current on its reduced payment agreement with ADOR.

**Maxim**

42.     In addition to the Lender's Loan encumbering the Hotel, Maxim Commercial Capital, LLC ("Maxim") asserts a junior lien on the Hotel and on the Debtor's personal property to secure an alleged equipment lease financing arrangement (the "Maxim Claim"). Maxim asserts that the amount of the Maxim Claim is $1.2 million.  Maxim has filed a UCC-1 financing statement with the Arizona Secretary of State and has recorded a Deed of Trust in the Maricopa County Recorder's Office with respect to this alleged obligation.

43.     Maxim asserts that other entities affiliated with the Debtor—*i.e.*, Khangura Development, LLC ("Khangura Development"), Optima Lodging, LLC ("Optima") and Crestwood Hospitality, LLC ("Crestwood")[2]—are obligated to pay the Maxim Claim.

---

[2] Crestwood is currently a Chapter 11 debtor-in-possession in Case No. 4:21-bk-03091-BMW pending in this District.

3043170.v2

44.     The Debtor disputes the propriety and amount of the Maxim Claim and Maxim's alleged liens.

### PPP and EIDL Loans

45.     During 2020, the Debtor took advantage of certain federal programs designed to provide financial relief to small businesses due to the COVID-19 pandemic.

46.     Specifically, the Debtor obtained Paycheck Protection Program ("PPP") loans in the amounts of approximately $140,455.47 from CIT Bank and $231,018 from Canyon Community Bank ("Canyon"), respectively, and an Economic Injury Disaster Loan ("EIDL") from the Small Business Administration ("SBA") in the amount of $150,000.

47.     The Debtor used the PPP loan funds as required by the PPP. The first PPP loan from CIT Bank has already been forgiven and the Debtor is in the process of seeking forgiveness on the second PPP loan from Canyon.

48.     The Debtor has used all of the EIDL loan funds. In connection with the EIDL, the SBA asserts a lien on the Debtor's personal property and has filed a UCC-1 Financing Statement with respect to such asserted lien.

### Franchise Fees

49.     HHC asserts that the Debtor was delinquent on certain fees and other amounts alleged to be due under the Franchise Agreement at the time of its termination.

50.     Specifically, HHC asserts that the Debtor is obligated to HHC in the amount of approximately $209,656 (not including alleged liquidated damages).

51.     The Debtor disputes this asserted liability to HHC.

### Furniture, Fixtures and Equipment Loans

52.     Finally, the Debtors have incurred certain furniture, fixtures and equipment ("FF&E") loans to third parties that are secured by purchase money security interests in the FF&E purchased by the Debtor with such loan proceeds.

### Debtor's Reservations of Rights Regarding Alleged Claims Against It

53.     The Debtor does not concede (a) the validity, enforceability, extent, amount or

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

priority of the Lender's Loan, the Maxim Claim, the EIDL, or any other claims alleged to be secured by the Debtor's property (the "Asserted Secured Claims") or the respective asserted liens allegedly securing the Asserted Secured Claims (the "Asserted Liens"), (b) that the Asserted Liens properly encumber the Debtor's personal property, revenues, income, accounts receivable, work-in-progress, equipment, inventory, or other assets, or (c) that the Debtor's income and revenue from the Endeavors Contract or otherwise, its accounts receivable, work-in-progress or inventory constitute any party's cash collateral. The Debtor expressly reserves the right to contest any liens or to object to the claims related thereto.

54.    The Debtor does not concede the validity or amount of any claims asserted by any alleged creditor of the Debtor.

### The Total Amount of Asserted Secured Claims Encumbering the Hotel and the Total Amount of Estimated Claims Against the Estate

55.    The total amount of asserted secured claims encumbering the Hotel as of the Petition Date is, therefore, approximately $10.5 million (approximately $9.3 million asserted by the Lender and approximately $1.2 million asserted by Maxim).

56.    The Debtor estimates that all remaining claims against the Debtor, including the ADOR claims, HHC's asserted claims (which the Debtor disputes), EIDL and PPP (which is forgivable) loans, FF&E loans, and vendor and other debts is less than $2.5 million.

57.    **Consequently, the value of the Hotel, based on the Purchase Price, exceeds the amount of all _asserted_ claims against the Debtor's estate by at least approximately $4.5 million.**

58.    Again, the Debtor disputes the amount and validity of some of the asserted claims and the Debtor's equity could be substantially higher.

### Ledgestone Hospitality

59.    In February 2019, after discovering AHI's failure to file TPT tax returns and pay TPT taxes, the Debtor removed AHI and retained Ledgestone to manage the Hotel.

60.    Specifically, the Debtor and Ledgestone are parties to that certain *Management Agreement* dated February 12, 2020 ("Management Agreement"). A copy of the

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

Management Agreement is attached to the Statement of Facts as Exhibit "A."

61. Although Ledgestone had been operating the Hotel since February 2019, Ledgestone and the Debtor entered into the current Management Agreement in February 2020 to reflect certain changes in their arrangement and to provide for a term of up to three years.

**Ledgestone's Performance Under the Management Agreement**

62. Since its initial retention by the Debtor in February 2019, Ledgestone has professionally, efficiently, and properly operated and managed the Hotel pursuant to the terms and requirements of the Management Agreement.

63. Ledgestone has also worked with and assisted the Debtor in connection with, among other things, its agreement with ADOR concerning the delinquent sales taxes and its negotiations with the Lender regarding the alleged defaults under the Loan.

64. Ledgestone has extensive and intimate knowledge of the Debtor's business, financial affairs, operations, and capital and debt structure.

65. Given its management role for the past two years, Ledgestone has been instrumental in assisting the Debtor and its bankruptcy counsel in preparing the Debtor for this bankruptcy filing, including the preparation of first day motions, schedules of assets and liabilities and other necessary administrative matters in the bankruptcy case.

66. The Debtor trusts Ledgestone and its ability to continue managing and operating the Hotel in a professional and efficient manner during the course of this Chapter 11 proceeding.

67. Ultimately, Ledgestone is well qualified, well positioned, and uniquely suited to continue operating and managing the Hotel for the Debtor.

68. Accordingly, the Debtor submits that its post-petition retention of Ledgestone to manage and operate the Hotel is necessary and appropriate and in the best interests of the Debtor, its bankruptcy estate, its creditors, and all other parties in interest.

**The Sale to SRE**

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

69.     In 2020, while the hospitality industry was in decline due to the COVID pandemic and the Debtor was struggling to comply with the PIP requirements of the Franchise Agreement, SRE approached the Debtor concerning SRE's purchase of the Hotel and the conversion of the Hotel to apartments.

70.     Since the proposed purchase price of $17,500,000 ("Purchase Price") was sufficient to pay the Lender's Loan, the delinquent TPT taxes, and other claims, in full, and a sale would negate any obligation to raise and expend additional capital to comply with the PIP requirements or to renovate the Hotel to operate under a different hospitality "flag," the Debtor agreed to sell the Hotel to SRE.

71.     Indeed, the Debtor is informed and believes that the Purchase Price is, at least, commensurate with the value of similarly situated properties, and is likely above market price as a hotel due to the prospects of the apartment and the current state of the hospitality industry.

72.     Therefore, on December 8, 2020, the Debtor entered into the PSA with SRE for the sale of the Hotel. A copy of the PSA is attached to the Statement of Facts as Exhibit "C."

73.     SRE is wholly unrelated to the Debtor.

74.     The PSA was negotiated at arms length, pre-petition, by the parties, both of whom were represented by highly competent counsel.

75.     The Debtor seeks to sell the Hotel to SRE pursuant to the PSA without subjecting the sale to higher and better bids because, among other things,

    a.     The amount of the Purchase Price exceeds the amount of all asserted claims against the Debtor, including all secured claims; consequently, a higher and better price will benefit only the Owners, and the Owners have determined that it is in their best interests;

    b.     SRE has already expended significant capital and time in connection with its purchase of the Hotel and would likely request a sizeable break-up fee in the

3043176.v2

event that the Hotel becomes subject to an auction process;

  c. The prospect of opening the sale of the Hotel to an auction process may make SRE reconsider its purchase of the Hotel and losing SRE as a bidder, given the Purchase Price, would be detrimental to the Debtor, its estate and its creditors; and

  d. Establishing and implementing bidding procedures, including the establishment of a break-up fee in the event SRE agrees to be a stalking horse bidder, would be prohibitively expensive and a waste of estate resources, particularly given the amount of the Purchase Price and the fact that the Purchase Price is sufficient to pay all asserted claims, in full.

**The Endeavors Contract**

76. In early May 2021, the Debtor was approached by Endeavors, about the possibility of utilizing the hotel as an emergency family staging center ("EFSC") pursuant to Endeavors' contract with the Department of Homeland Security, U.S. Immigration and Customs Enforcement (*i.e.*, the Government).

77. I understand that Endeavors is a Texas-based non-profit organization that provides services to vulnerable people in times of crisis. *See e.g.* https://endeavors.org/.

78. I further understand that, recently, Endeavors entered a contract with the Government (the "Primary Contract") whereby Endeavors is to provide temporary shelter and other related services in a safe and secure environment for non-citizen families.

79. Upon information and belief, in addition to the operation of the EFSC at the Hotel pursuant to the Endeavors Contract, discussed below, Endeavors operates three other EFCS facilities in Texas and one in Phoenix.

80. Since the Debtor was operating the Hotel as an independent, un-flagged hotel, and was laboring to generate sufficient cash flow to pay for operations due to decreased demand on account of the continuing COVID crisis, the Debtor determined, in its best business judgment, that entering into a contract with Endeavors to generate significant cash flow pending the sale of the Hotel to SRE was in its, and its creditors', best interests.

Case 2:21-bk-04096-BKM Doc 36 Filed 06/04/21 Entered 06/04/21 19:36:53 Desc
Main Document Page 11 of 23
3043170.v2
11

81.     Indeed, prior to entering into the Endeavors Contract, the Debtor investigated Endeavors and its operations, and has confirmed through conversations with Endeavors and otherwise, among other things, that:

A.     **The maximum number of people that will be housed at the Hotel at any given time is approximately 200 or fewer people, because there are only a total of approximately 151 beds at the Hotel** (in addition to beds, some rooms can accommodate cribs and roll-aways, depending on the size and configuration of the family);

B.     Endeavors is required to comply with all local, state, and federal laws, including occupancy restrictions and fire code requirements;

C.     Each length of stay for residents is limited to no longer than 120 hours, with a preferred and aimed length of stay of less than 72 hours;

D.     In fact, Endeavors does not house a family for longer than 72 hours unless a family member has tested positive for COVID, then the maximum length of stay is 120 hours;

E.     The average length of stay in Endeavors' other ECFS facilities is approximately 50 hours and, in the Phoenix facility, is approximately 47 hours;

F.     The Hotel will not house single adults and will not house unaccompanied children;

G.     The Hotel will only house families, and the average family size is approximately five people;

H.     All residents of the Hotel will be pre-screened by the Government and none will have a criminal history;

I.     Endeavors will provide case management services, food, transportation to and from the Hotel, medical care, clothing, and other life-essentials to the residents during their stay at the Hotel;

J.     Endeavors' staff will be on-site 24 hours per day, 7 days per week and

304170.v2

will provide medical personnel and unarmed security for the residents;

   K. Residents will not be allowed to leave the Hotel during their brief stay;

   L. The Debtor's housekeeping, maintenance and administrative staff will, subject to completing background checks, remain employed by the Debtor and will continue to provide services to the residents and the Hotel;

   M. All pick-ups and drop-offs of residents are coordinated with, and fully monitored by, the Government; and

   N. Endeavors treats the residents with humanity, dignity, and respect while they are ushered through the immigration process.

82. In pleadings filed in the State Court Litigation, the Lender erroneously alleged that, under the Endeavors Contract, Endeavors could house as many as 1,200 people at the Hotel. However, the reference to "1,200 residents" is contained in "Attachment A" to the Endeavors Contract. Attachment A to the Endeavors Contract is an overview of the "Scope of Work" under the Primary Contract between Endeavors and the Government. Pursuant to the Primary Contract, Endeavors is authorized to provide shelter for up to 1,200 residents in all of its facilities, combined.

83. The Endeavors Contract between Endeavors and the Debtor does not provide for the Hotel to accommodate 1,200 people. Indeed, since the Hotel only has approximately 151 beds, it would be logistically and legally impossible for the Hotel to house 1,200 people at a time.

84. **To be clear, Endeavors will not house 1,200 people at the Hotel and the Endeavors Contract does not provide for the housing of 1,200 people at the Hotel.**

85. The **maximum** number of people that will be housed at the Hotel at any given time will be no more than approximately 200 people.

86. The Endeavors Contract is financially beneficial to the Debtor. Specifically, the Endeavors Contract provides for funding to the Debtor of up to $1,336,593 for the four month period governed by the Endeavors Contract (*i.e.* from May 23, 2021 to September 30,

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

3043170.v2

2021).

87.     __Pursuant to the payment formula in the Endeavors Contract, the Debtor will receive at least approximately $316,000 of revenue per month.__

88.     Further, the Endeavors Contract provides that "[Endeavors] shall at its sole expense maintain the property in good operating order, repair, condition, and appearance other than normal wear and tear, acts of God, and natural disasters and at all times during the Term otherwise keep the facility described in Attachment C (known as the Suites on Scottsdale in Scottsdale, Arizona (the 'Property') in Eligible Condition. [Endeavors] shall also surrender the property in good repair." *See* Modification at § H.40.

89.     Additionally, the term of the Endeavors Contract (through September 30, 2021, with the possibility of an extension at the Debtor's option) is such that it allows the Debtor to generate revenue while SRE completes its discussions with the City of Scottsdale regarding the Zoning Approvals and, potentially, until the sale to SRE is consummated.

90.     Also, because the Endeavors Contract is a federal government contract, it requires that the Debtor significantly increase the amount of wages and benefits to be paid to the Debtor's employees and will allow the Debtor to hire additional employees at these higher wages.  Of course, this is a significant benefit to the Debtor's employees.

91.     Finally, Endeavors has assured the Debtor that Endeavors is committed to dealing with local vendors to supply and operate the Hotel under the Endeavors Contract. The economic benefit to the local community will be significant.

92.     Given the multitude of financial benefits to the Debtor, the fact that entry into the Endeavors Contract would have no impact on the sale of the Hotel to SRE, and the assurances that the Hotel will be properly maintained during, and surrendered in good repair following, the term of the Endeavors Contract, the Debtor determined that it was in its best interests, and the best interests of the Debtor's creditors, to enter into the Endeavors Contract.

93.     Accordingly, on May 13, 2021, the Debtor entered into the Endeavors Contract.  A copy of the Endeavors Contract is attached hereto as Exhibit "D."

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

94. Although the Endeavors Contract provides that it may be terminated upon the filing of bankruptcy by the Debtor, Endeavors has confirmed to the Debtor that it has elected not to terminate the Endeavors Contract but, rather, supports the Debtor's assumption of the Endeavors Contract.

95. Endeavors has informed the Debtor that, prior to accepting residents at the Hotel, Endeavors spoke with the Assistant City Manager for the City of Scottsdale and confirmed that the City of Scottsdale has no zoning or other legal restrictions for the operation of the Hotel as an EFSC pursuant to the Endeavors Contract.

96. Endeavors took possession of the Hotel on May 23, 2021 and has started housing families at the Hotel.

**The Need for Interim DIP Financing**

97. Payments to the Debtor from Endeavors pursuant to the Endeavors Contract are not scheduled to begin until July 15, 2021.

98. As of the Petition Date, the Debtor does not have sufficient cash on hand, and does not have any other source of revenue, to pay ordinary and necessary operating expenses that will be incurred between the Petition Date and July 15, 2021 (the "Revenue Gap Period").

99. Further, as discussed below, the Debtor made certain payments by check to employees, critical vendors, and the ADOR prior to the Petition Date which may not have cleared the Debtor's pre-petition bank account(s) prior to their closure due to the bankruptcy filing. Such payments will be declined when the recipients attempt to negotiate the checks.

100. Additionally, as discussed below, the Debtor has been required to obtain new general liability and property insurance policies. Although the Debtor seeks to finance a portion of the premiums for these new policies, a portion of the premiums is required to be paid within 30 days. Since the Debtor does not have sufficient funds to pay such premiums, the Debtor desires to use the DIP Loan to pay that portion of the insurance premiums.

101. As of the Petition Date, the Debtor had twelve employees (the "Employees").

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

3043170.v2

The Debtor's payroll system is based upon bi-weekly pay periods, which end on the first and fifteenth of each month. Payments to the Employees are generally made on the fifth and twentieth day of each month for the prior two week period. The Debtor last paid its employees on May 20, 2021 for the period from May 1, 2021 through May 15, 2021. The Debtor's next payroll is due on June 4, 2021 for the period from May 16, 2021 through May 31, 2021 (the "Second May Payroll").

102. Since the Debtor filed its bankruptcy petition on May 26, 2021, there are eleven days of pre-petition payroll that was due to Employees. As of the Petition Date, there existed approximately $9,919.14 in earned but unpaid wages owing to the Employees for the Second May Payroll in addition to approximately $786.26 in payroll taxes associated with those unpaid wages (collectively, the "Pre-Petition Wages"). The greatest combined amount of earned Pre-Petition Wages due to any individual is under $2,000 (*i.e.*, well under the statutory priority cap of $13,650 per individual).

103. Because the Bankruptcy Code prohibits the payment of pre-petition claims by the Debtor without Court authority, and it was absolutely necessary for the Employees to receive payment for the full pay period that was due on June 4, 2021, the Owners advanced the funds necessary to pay the Pre-Petition Wages.

104. The Debtor believes that if the Employees had not been promptly and fully paid for their pre-petition employment, a meaningful number of Employees would have terminate their employment with the Debtor, and that any such termination would materially harm the Debtor's operations.

105. Ultimately, in order to maintain its workforce and its relationships with critical vendors, to continue receiving necessary goods and services from the employees and critical vendors, and to avoid the incurrence of interest and penalties with respect to delinquent TPT taxes, it will be necessary for the Debtor to pay certain pre-petition amounts due and owing to the employees, critical vendors and ADOR that arose simply because the payments to such parties were stopped due to the closure of the Debtor's pre-petition bank accounts.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

106.    Consequently, it is necessary for the Debtor to obtain unsecured, short-term, interim post-petition financing in order to pay its expenses, including insurance premiums, payroll, utilities, and other ordinary and necessary operating expenses incurred during the Revenue Gap Period and, pre-petition wages, critical vendors and currently due pre-petition TPT taxes that are approved for payment by the Court (the "Approved Pre-Petition Claims").

107.    To that end, the Owners have agreed to make an unsecured post-petition loan to the Debtor (the "DIP Loan") in the maximum amount of $150,000.

108.    The terms of the proposed DIP Loan are as follows:

•    <u>Principal Amount:</u> The DIP Loan will be in the principal amount of $150,000;

•    <u>Use of DIP Loan Funds:</u> The DIP Loan will be sued solely to pay (a) the Debtor's ordinary and necessary operating expenses during the Revenue Gap Period pursuant to the budget attached to the Statement of Facts as Exhibit "E" (the "Budget") and any Approved Pre-Petition Claims. The Budget is incorporated herein by this reference.

•    <u>Interest Rate:</u> No interest will accrue on the DIP Loan.

•    <u>Maturity:</u> The DIP Loan will mature on the earlier of: (a) the first day on which any Chapter 11 plan for the Debtor becomes effective; or (b) one year from the date on which the DIP Loan proceeds are advanced (the "Maturity Date"). Upon the Maturity Date, the entire outstanding balance of the DIP Loan shall become immediately due and payable.

•    <u>Unsecured Loan-Administrative Priority</u>: The DIP Loan will be an unsecured loan and will be treated as an allowed administrative expense priority claim pursuant to 11 U.S.C. §§ 364(b) and 503(b)(1). The Owners do not seek any liens, other security, or priming status in connection with the DIP Loan.

•    <u>Disclosure of Insider Status:</u> The lenders of the DIP Loan are the Owners of the Debtor.

109.    The Owners and the Debtor request that the Owners' advance to the Debtor to

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

pay the Pre-Petition Wages be included in the DIP Loan and be repaid consistent with any other advances made under the DIP Loan.

**Cash Collateral Use**

110. Once Endeavors begins making payments to the Debtor pursuant to the Endeavors Contract, the Debtor will require the use of the revenues from the Endeavors Contract (the "Revenues") to pay its ordinary and necessary operating expenses, payroll, and other general and administrative expenses (collectively, the "Expenses") and to preserve the value of the Debtor's business pending the sale of the Hotel to SRE.

111. The Budget attached to the Statement of Facts as Exhibit "E" is a projection of the Debtor's anticipated post-petition Revenues and its anticipated Expenses for the period from the Petition Date through September 30, 2021.

112. It would be inequitable and would be detrimental to all creditors, employees, vendors, and other constituents in this case if the Debtor were not allowed to use the Revenues to pay the Expenses and operate the Hotel pursuant to the Budget (with a 10% variance) until the sale of the Hotel to SRE.

113. The Debtor's business operations, and its prospects for a successful reorganization, will suffer immediate and irreparable harm if the Debtor is not allowed to use the Revenues to pay the Expenses.

114. Accordingly, the Debtor requests authority to use the Revenues generated by the Endeavors Contract to pay the Expenses in accordance with the Cash Collateral Budget beginning July 15, 2021 through September 30, 2021, with a ten percent (10%) variance permissible on a total budget basis.

115. The Debtor submits that any creditors asserting a lien in the Revenues, including the Lender (collectively, the "Secured Creditors"), are and will be adequately protected by (a) the $17,500,000 value of the Hotel (which exceeds the amount of the Lender's asserted claim by approximately $8.2 million (***i.e.* an 88% equity cushion**)), (b) the value generated through the Debtor's continued post-petition operations, and (c) a

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

replacement lien (with the same validity, extent, and priority as their respective pre-petition liens) in post-petition Revenues.

**Critical Vendors and Pre-Petition TPT Taxes**

116.    In the ordinary course of its business, the Debtor utilizes various vendors to provide goods and services that are critical to the Debtor's operations.

117.    For example, Ledgestone, the Debtor's hotel manager and operator, who is critical to the Debtor's operations, is owed pre-petition fees and expense reimbursements in the amount of $3,424.05.

118.    Additionally, the Debtor requires services from a variety of utilities for the operation of the Hotel, including, for example, APS provides electrical service, AT&T provides internet service, the City of Scottsdale provides water and sewer services, Sonifi Solutions provides cable television services, Southwest Gas provides gas, and Windstream provides high speed internet services.

119.    The Debtor also uses temporary labor services, Action Staffing and Hire Quest, to provide supplemental housekeeping staff.

120.    The Hotel also requires certain licenses and permits issued by Maricopa County (Consumer Health and Food Safety) for the operation of the Hotel.

121.    Attached to the Statement of Facts as Exhibit "F" is a schedule showing the Critical Vendors, the goods and/or services that each provides, and the amount that each is owed on account of prepetition goods and services provided.

122.    It is critical that the Debtor remain current on their obligations to the Critical Vendors so as to minimize the possibility of any disruption to the Debtor's operations.

123.    The process of identifying the Critical Vendors was undertaken by the Debtor's senior management.

124.    Only vendors that met one or more of the following criteria were designated as Critical Vendors:

3043170.v2

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

a. Vendors whose products or services are critical to the Debtor's business operations and essential to reorganization, including utility providers;

b. Vendors for whom there is no ready replacement supplier of similar goods or services at comparable prices;

c. Vendors, the replacement of whom would entail significant delay and expense; and

d. Vendors that would likely refuse to continue to provide services post-petition without payment of their outstanding invoices.

125. As demonstrated by Exhibit "F," the Debtor estimate that as of the Petitions Date, a total of only approximately $49,857.35 (the "Required Amount") was owed to the Critical Vendors and is sought to be paid pursuant to this motion.

126. The Debtor submits that if the Critical Vendors are not promptly paid the Required Amount on account of their prepetition claims, there would be a material negative impact on the Debtor's operations and potentially on its prospects for a successful reorganization.

127. Furthermore, the Debtor submits that the use of the DIP Loan funds and/or cash collateral to pay the Required Amount to the Critical Vendors is appropriate as the payments to the Critical Vendors, just as the payment of other ordinary course expenses, will preserve and protect the collateral of any secured party asserting an interest in cash collateral.

128. Finally, the Debtor incurred, and charged its guests and customers for, pre-petition transaction privilege taxes that are payable at the end of each month. The Debtor delivered as payment, by check, to ADOR to pay the accrued pre-petition transaction privilege taxes (the "TPT Taxes") in the amount of $10,687.78, but such check did not clear the Debtor's pre-petition bank accounts before they were closed. Therefore, in order to avoid the penalties and interest on this payment, and because the funds received and retained by the Debtor to pay the TPT Taxes are, arguably, held in trust for the taxing authorities, the Debtor, out of an abundance of caution, nevertheless seeks authority to pay the pre-petition

TPT Taxes post-petition.

**Insurance Premium Financing**

129.    The operation of the Debtor's business requires that the Debtor have certain insurance policies in place, including Property and General Liability ("GL") policies (collectively, the "Policies").

130.    Although the Debtor has such Policies in place pre-petition, the existence of the Endeavors Contract has required that the Debtor replace its existing Policies with new Property and GL policies.

131.    Endeavors has agreed to pay the sum of $45,000 to defray a significant portion of the costs for the new Policies (the "Endeavors Insurance Payment").

132.    The Debtor worked with Western Hospitality Insurance Group (the "Broker") to shop the market and identify the best rates for the new Policies.

133.    To that end, the Broker has been able to secure new Policies for the Debtor.

134.    Specifically, with respect to the new GL Policy, the Policy premium amount is $30,374 and the insurance company has required that the premium be paid one-half up front and the remainder in thirty days.

135.    With the understanding that the Endeavors Insurance Payment will be used to reimburse it, the Debtor's Broker advanced to the insurance company the first one-half of the GL Policy premium ($14,997).

136.    The other one-half of the CL Policy premium will be paid on or around June 28, 2021 from the proceeds of the DIP Loan.[3]

137.    With respect to the Property Policy, the total premium is $83,334.

138.    The Debtor intends to finance this premium through IPFS Corporation (the "Finance Company"), which has agreed to finance a portion of the Property Policy premium, subject to Court approval.

_____

[3] The Debtor may receive a refund from its prior insurer for premiums paid under the prior policy. Any such refunds will be applied to the balance of the GL Policy premium that is due on or before June 28, 2021.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

139.     The Finance Company has required a down-payment in the amount of $31,279.40 (the "Down-payment").

140.     The Down-payment will be paid from the Endeavors Insurance Payment.

141.     The remainder of the Property Policy premium will be financed (the "Financing") by the Finance Company on the terms set forth in the Premium Finance Agreement attached to the Statement of Facts as Exhibit "G."

142.     Generally, the terms of the Financing are as follows:

- Borrower:  The Debtor is the borrower under the Financing.

- Use of Financing Funds:  The Financing will be used to pay the balance of the Property Policy premiums, after application of the Down-payment.

- Payment Terms:   In addition, to the Down Payment, the Debtors will make nine (9) monthly payments of $6,012.12 beginning on June 30, 2021 and on the last day of each subsequent month.

- Interest Rate:  The Financing bears interest at the annual non-default rate of 9.375%.

- Security:  The Finance Agreement that a security agreement granting the Finance Company a secured interest in any unearned premiums, returned premiums, dividend payments, and loss payments that reduce the unearned premiums (the "Unearned Premiums"), and which further authorizes the Finance Company to cancel the financed Policies and obtain the return of any Unearned Premiums, dividends, and certain loss payments in the event of a default in the payment of any installment due.

- Additional Terms:  Further terms and conditions are contained in the Finance Agreement which is incorporated herein by reference.

143.     Obtaining the new Policies, allowing Endeavors to pay the Endeavors Insurance Payment, and entering into the Finance Agreement are in the best interests of the Debtor, its estate, and its creditors.

144.     In fact, in the ordinary course of business, the Debtor regularly obtained

3043170.v2

financing for its annual insurance premiums to spread out the large annual payment over the course of the year.

145.    The Debtor requires continuing insurance coverage under the Policies to protect its assets, employees, and creditors, and to ensure continued operations.

146.    The Debtor has worked with the Broker to locate the best available insurance policies and financing to pay for the Policy premiums.

147.    The Debtor conducted its due diligence by investigating, through the Broker, insurance policies and premium financing from numerous sources. The Policies and Financing are the best option available. The Debtor does not believe that it will be able to obtain insurance policies or financing on terms more favorable than those proposed under the Policies or the Financing from the Finance Company.

148.    Ultimately, the Debtor believes that the foregoing terms for the procurement, funding and financing of the Policies are commercially fair and reasonable. Without insurance, the Debtors could be forced to cease operations.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

DATED:   June 4, 2021.

*/s/ Sukhbinder Khangura*
Sukhbinder Khangura

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

3043170.v2