Randy Nussbaum (SBN 006417)
Randy.Nussbaum@SacksTierney.com
Philip R. Rudd (SBN 014026)
Philip.Rudd@SacksTierney.com
Sierra M. Minder (SBN 035795)
Sierra.Minder@SacksTierney.com
**SACKS TIERNEY P.A.**
4250 N. Drinkwater Blvd., 4th Floor
Scottsdale, AZ 85251-3693
Telephone: 480.425.2600
Facsimile: 480.970.4610
*Attorneys for Debtor*

# IN THE UNITED STATES BANKRUPTCY COURT

# THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 Proceedings |
| WOODBRIDGE HOSPITALITY, L.L.C., | Case No. 2:21-bk-04096-BKM |
| Debtor. | **DISCLOSURE STATEMENT IN SUPPORT OF PLAN OF REORGANIZATION DATED SEPTEMBER 22, 2021** |

Woodbridge Hospitality, L.L.C. (the "Debtor"), as debtor and debtor-in-possession in the above-captioned bankruptcy case, hereby submits to the Court and creditors of its estate the following *Disclosure Statement in Support of Plan of Reorganization Dated September 22, 2021* ("Disclosure Statement") pursuant to 11 U.S.C. § 1125.

## I. INTRODUCTION

Section 1125(b) of the Bankruptcy Code prohibits the solicitation of acceptances or rejections of a plan of reorganization unless such plan is accompanied by a copy of the Disclosure Statement which has been approved by the Bankruptcy Court.

The purpose of this Disclosure Statement is to provide creditors and interested parties in this bankruptcy proceeding with such information as is sufficient to allow them to make an informed decision regarding the Debtor's *Plan of Reorganization Dated September*

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

*22, 2021*, filed on September 22, 2021 (the "Plan").[1] **The Plan is incorporated herein by this reference and should be read in conjunction with this Disclosure Statement.** Unless otherwise indicated herein, capitalized terms used herein shall have the meanings given to them in the Plan or in the Bankruptcy Code.

This Disclosure Statement contains information that may influence your decision to accept or reject the Debtor's proposed Plan. Please read this document with care.

Unless otherwise noted, those portions of the Plan and this Disclosure Statement providing factual information concerning the Debtor, its assets, and its liabilities, have been prepared from information submitted by the Debtor. The Debtor and the professionals employed by the Debtor have utilized relevant, non-privileged information provided by the Debtor in preparing this Disclosure Statement and the Plan.

The financial information contained in this Disclosure Statement has not been subjected to an audit by an independent certified public accountant. For that reason, the Debtor is not able to warrant or represent that the information contained in this Disclosure Statement is without any inaccuracy. To the extent practicable, the information has been prepared from the Debtor's financial books and records and great effort has been made to ensure that all such information is fairly represented.

This Disclosure Statement and the Plan will classify all creditors into classes. The treatment of each class of creditors will be set forth in this Disclosure Statement and in the Plan. You should carefully examine the treatment of the class to which your claim will be assigned.

This Disclosure Statement requires approval by the Bankruptcy Court after notice and a hearing pursuant to 11 U.S.C. §1125(b). Once approved, the Disclosure Statement and a Ballot will be distributed with the Debtor's proposed Plan for voting. Approval of the

---

[1] In addition to the information provided herein, the Debtor incorporates herein the background facts and information set forth in the Statement of Facts, the declarations referred to therein, the *Declaration of Michael Harris* filed on July 6, 2021 [Dkt. No. 134], and the *Supplemental Declaration of Sukhbinder Khangura* filed on July 6, 2021 [Dkt. No. 135].

3120052.v1

Disclosure Statement by the Bankruptcy Court does not constitute either certification or approval of the Debtor's Plan by the Bankruptcy Court or that the Disclosure Statement is without any inaccuracy.

The Bankruptcy Court will confirm the Plan if the requirements of Section 1129 of the Bankruptcy Code are satisfied. The Bankruptcy Court must determine whether the Plan has been accepted by each impaired class entitled to vote on the Plan. Impaired classes entitled to vote on the Plan are those classes of claims whose legal, equitable, or contractual rights are altered, as defined under Section 1124 of the Bankruptcy Code. An impaired class of claims is deemed to have accepted the Plan if at least two-thirds (2/3) in amount of those claims who vote and more than one-half (1/2) in number of those claims who vote have accepted the Plan. An impaired class of interests is deemed to have accepted the Plan if the Plan has been accepted by at least two-thirds (2/3) in amount of the allowed interests who vote on the Plan.

Only the votes of those Creditors or interested parties whose ballots are timely received will be counted in determining whether a class has accepted the Plan. Even if each class of Creditors does not accept the Plan, the Plan can be confirmed under Section 1129(b) of the Bankruptcy Code, so long as one impaired class of Creditors accepts the Plan.

## II. DEFINITIONS

Unless otherwise defined herein, capitalized terms shall have meanings ascribed to them in the Plan.

## III. HISTORY OF THE DEBTOR

### A. The Debtor

The Debtor is an Arizona limited liability company formed in December 2002. The Debtor's members are the Sukhbinder & Rupinder Khangura Family Revocable Trust dated May 19, 2008 (the "Suky & Rupi Trust") and the Jasbir Khangura Revocable Trust dated July 13, 2013 (the "Jas Trust") (collectively, the "Owners"). The beneficiaries of the Suky & Rupi Trust are Sukhbinder Khangura ("Suky") and Rupinder Khangura ("Rupi"), and

3120052.v1

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

the beneficiary of the Jas Trust is Jasbir Khangura ("Jas").

On May 26, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Arizona. The Debtor is authorized to operate its business as debtor-in-possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

## B.    The Debtor's Property

The Debtor owns the Suites on Scottsdale hotel located at 9880 North Scottsdale Road in Scottsdale, Arizona (the "Property"). As discussed below, Ledgestone has been managing and operating the Property for the Debtor since January 2019.

The Debtor acquired the Property in February 2003 and, until December 30, 2020, operated the Property as a Homewood Suites by Hilton pursuant to a Franchise License Agreement dated February 14, 2003 (the "Franchise Agreement") with Promus Hotels, Inc., a subsidiary of Hilton Hotels Corporation ("HHC"). The Franchise Agreement, which was set to expire in February 2023 by its own terms, was terminated by HHC on December 30, 2020. Prior to the termination of the Franchise Agreement in late December 2020, the Debtor did not fully perform all of the "property improvement program" ("PIP") requirements under the HHC Franchise Agreement and, therefore, did not pass several HHC "Quality Assurance" inspections. Even though the Debtor proposed to pay between $6 million and $10 million to improve the Property and satisfy the PIP requirements, HHC indicated to the Debtor that it was not interested in extending the Franchise Agreement beyond its expiration in February 2023. Consequently, the Debtor chose not to expend the capital to make the PIP improvements. Therefore, HHC terminated the Franchise Agreement effective December 30, 2020.

The Property has 114 guest suites, of which approximately 95 are currently configured for guests (the rest are used as office and/or storage space) with a total of approximately 151 beds, two corporate meeting rooms, a business center, an outdoor pool, a fitness center, and other guest amenities, including a breakfast kitchen area. As of the Petition Date, the Debtor had twelve employees, although the number of employees

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

fluctuates with the seasons and general employee attrition.

Historically, the Debtor operated profitably. In fact, in 2019, under Ledgestone's management, the Debtor had revenues of approximately $3,831,000, and $819,203 in annual profit (after interest). Like many industries, the hospitality industry in general, and the Property specifically, were significantly adversely affected by the global COVID-19 pandemic, and the Debtor's operations and revenues suffered greatly in 2020. In fact, the Debtor's revenues declined by approximately 69% in 2020.

As discussed below, on December 8, 2020, the Debtor entered into a *Purchase and Sale Agreement* ("SRE PSA") providing for the sale of the Property to SRE for a purchase price of $17.5 million (the "Purchase Price"). SRE intends to convert the Property to apartments.

Between December 30, 2020 and approximately May 22, 2021, the Debtor operated the Property as an independent hotel.

As discussed below, on May 13, 2021, the Debtor entered into that certain *Subcontract Agreement in Support of Department of Homeland Security (DHS), Immigration and Customs Enforcement (ICE) Emergency Family Staging Centers (EFCS)* (together with that certain *Modification of Subcontract Agreement (Modification 01)* dated May 28, 2021 (the "Modification"), the "Endeavors Contract") with Family Endeavors, Inc., a Texas non-profit corporation d/b/a San Antonio Family Endeavors ("Endeavors"), which provides for the operation of the Property as a temporary shelter and emergency family staging center for non-citizen families under the supervision of the Department of Homeland Security, Immigration and Customs Enforcement (the "Government"). Endeavors began housing families at the Property on or about May 28, 2021.

The Endeavors Contract was originally scheduled to expire on September 30, 2021, but provides for an extension through December 31, 2021. Endeavors has requested that the Debtor agree to extend the Endeavors Contract to December 31, 2021, and the Debtor has agreed to that request after consultation with SRE.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

## C.    The Debtor's Debt

### Wilmington Trust

The Property is encumbered by an asserted first position deed of trust in favor of Wilmington Trust, National Association, as Trustee, for the benefit of the holders of COMM 2015-CCRE26 Mortgage Trust Commercial Mortgage Pass-Through Certificates (the "Lender" or "Wilmington Trust")), by and through CWCapital Asset Management LLC, special servicer for the Lender. The Lender asserts that, as of April 12, 2021, the total outstanding balance due to the Lender on the loan allegedly secured by the Property (the "Loan") was $9,345,311.88. The Debtor disputes the amount alleged to be due to the Lender.

When the Debtor's revenues declined in 2020, the Debtor fell behind in its payments to the Lender, and the Lender accelerated the Loan. The Lender asserts that the Debtor is in default under the Loan for, among other things, the Debtor's failure to make payments to the Lender.

### ADOR—Delinquent TPT Taxes

In 2017 and 2018, the previous management company that operated the Property for the Debtor, American Hospitality Inc. ("AHI"), failed to file returns for, and to pay, Arizona State transaction privilege taxes ("TPT") for the Debtor, resulting in a tax liability to the State of Arizona in excess of $1.2 million. In February 2019, after discovering AHI's unauthorized failure to file TPT returns and pay the TPT taxes, the Debtor removed AHI as its hotel manager, and retained Ledgestone to manage the Property. Ledgestone continues to manage the Property and has timely filed returns for, and paid, all Arizona State (and other local) TPT and other taxes.

In 2019, the Debtor (with Ledgestone's assistance) entered into an agreement with the Arizona Department of Revenue ("ADOR") to make payments to ADOR of $45,000 per month to reduce the delinquent TPT taxes. Pursuant to a global workout with ADOR involving the Debtor and an affiliated entity, these payments to ADOR were reduced to $22,500 per month. Upon the onset of the COVID-19 pandemic, the Debtor and ADOR

agreed to reduce the monthly payments on the delinquent TPT taxes to $4,000 per month. As of the Petition Date, the Debtor was current on its reduced payment agreement with ADOR.

The ADOR has asserted a priority claim in the amount of $318,049.73, and a general unsecured claim in the amount of $737,057.49, against the Debtor.

### Maxim

In addition to the Lender's Loan encumbering the Property, Maxim Commercial Capital, LLC ("Maxim") asserts a junior lien on the Property and on the Debtor's Personal Property, to secure an alleged equipment lease financing arrangement (the "Maxim Claim"). Maxim asserts that the amount of the Maxim Claim is $1,417,192.20. Maxim has filed a UCC-1 financing statement with the Arizona Secretary of State and has recorded a Deed of Trust in the Maricopa County Recorder's Office with respect to this alleged obligation.

Maxim asserts that other entities affiliated with the Debtor—*i.e.*, Khangura Development, LLC ("Khangura Development"), Optima Lodging, LLC ("Optima") and Crestwood Hospitality, LLC ("Crestwood")[2]—are obligated to pay the Maxim Claim. The Debtor has reserved its rights to dispute the propriety and amount of the Maxim Claim and Maxim's alleged liens.

### PPP and EIDL Loans

During 2020, the Debtor took advantage of certain federal programs designed to provide financial relief to small businesses due to the COVID-19 pandemic. Specifically, the Debtor obtained Paycheck Protection Program ("PPP") loans in the amounts of approximately $140,455.47 from CIT Bank and $231,018 from Canyon Community Bank ("Canyon"), respectively, and an Economic Injury Disaster Loan ("EIDL") from the Small Business Administration ("SBA") in the amount of $150,000.

The Debtor has used the PPP loan funds as required by the PPP. The first PPP loan

---

[2] Crestwood is currently a Chapter 11 debtor-in-possession in Case No. 4:21-bk-03091-BMW pending in this District.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

3120052.v1

from CIT Bank has already been forgiven and the Debtor is in the process of seeking forgiveness on the second PPP loan from Canyon.

The Debtor has used all of the EIDL loan funds. In connection with the EIDL, the SBA asserts a lien on the Debtor's Personal Property and has filed a UCC-1 Financing Statement with respect to such asserted lien. The SBA has filed a secured proof of claim against the Debtor in the amount of $155,301.37.

### Franchise Fees

HHC asserts that the Debtor was delinquent on certain fees and other amounts alleged to be due under the Franchise Agreement at the time of its termination. Specifically, HHC has asserted an unsecured claim against the Debtor in the amount of $737,902, consisting of approximately $209,656 in franchise fees and $528,246 in alleged liquidated damages. The Debtor disputes HHC's claim for liquidated damages.

### Furniture, Fixtures and Equipment Loans

The Debtor has incurred certain furniture, fixtures, and equipment ("FF&E") loans to third parties that are secured by purchase money security interests in the FF&E purchased by the Debtor with such loan proceeds. Specifically, prior to the Petition Date, the Debtor borrowed approximately $5,632.27 from Rajest Patel and a similar amount from Waljeet Hundal to acquire necessary personal property (dishwashers and televisions) for use at the Property.

### General Unsecured Claims

Including the unsecured claims asserted against the Debtor by the ADOR and HHC, the Debtor has scheduled, and/or creditors have asserted, unsecured claims against the Debtor in the total amount of approximately $1,686,000 (not including affiliated entities' claims). This amount includes a claim in the amount of $77,010 by Arizona Horticultural Alliance, LLC, a landscaper that provided pre-petition services to the Debtor. The Debtor intends to dispute this claim.

### Debtor's Reservations of Rights Regarding Alleged Claims Against It

The Debtor does not concede (a) the validity, enforceability, extent, amount or

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

3120052.v1

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

priority of the Lender's Loan, the Maxim Claim, the EIDL, or any other claims alleged to be secured by the Debtor's assets (the "Asserted Secured Claims") or the respective asserted liens allegedly securing the Asserted Secured Claims (the "Asserted Liens"), (b) that the Asserted Liens properly encumber the Debtor's personal property, revenues, income, accounts receivable, work-in-progress, equipment, inventory, or other assets, or (c) that the Debtor's income and revenue from the Endeavors Contract or otherwise, its accounts receivable, work-in-progress or inventory constitute any party's cash collateral. The Debtor expressly reserves the right to contest any liens or to object to the claims related thereto. The Debtor does not concede the validity or amount of any claims asserted by any alleged creditor of the Debtor.

### The Total Amount of Asserted Secured Claims Encumbering the Property and the Total Amount of Estimated Claims Against the Estate

The total amount of *asserted* secured claims encumbering the Property as of the Petition Date is, therefore, approximately $10.9 million. The Debtor estimates that all remaining *asserted* claims against the Debtor, including the claims that the Debtor disputes, total approximately $2.1 million. Thus, the total amount of *asserted* claims against the Debtor is approximately $13,000,000. **Consequently, the value of the Property, based on the Purchase Price, exceeds the amount of all _asserted_ claims against the Debtor's estate by at least approximately $4.5 million.**

### D. Ledgestone Hospitality

In February 2019, after discovering AHI's failure to file TPT tax returns and pay TPT taxes, the Debtor removed AHI and retained Ledgestone to manage the Property. Specifically, the Debtor and Ledgestone are parties to that certain *Management Agreement* dated February 12, 2020 ("Management Agreement"). A copy of the Management Agreement is attached to the Statement of Facts as Exhibit "A." Although Ledgestone had been operating the Property since February 2019, Ledgestone and the Debtor entered into the current Management Agreement in February 2020 to reflect certain changes in their arrangement and to provide for a term of up to three years.

The Statement of Facts, which is incorporated herein, provides detailed information

concerning Ledgestone's extensive experience and expertise in managing hotels, its Management Agreement between Ledgestone and the Debtor, the highly competitive management fee charged by Ledgestone, and its performance under the Management Agreement. Ultimately, Ledgestone is well qualified, well positioned, and uniquely suited to continue operating and managing the Property for the Debtor.

### E. The Sale to SRE

In late 2020, while the hospitality industry was in decline due to the COVID pandemic and the Debtor was struggling to comply with the PIP requirements of the Franchise Agreement, SRE approached the Debtor seeking to purchase the Property and convert the Property to apartments. Since the proposed purchase price of $17,500,000 (*i.e.,* the Purchase Price) was and is sufficient to pay the Lender's Loan, the delinquent TPT taxes, and all other claims, in full, and a sale would negate any obligation to raise and expend additional capital to comply with the PIP requirements or to renovate the Property to operate under a different hospitality "flag," the Debtor agreed to sell the Property to SRE.

Indeed, the Debtor is informed and believes that the Purchase Price is, at least, commensurate with the value of similarly situated properties, and is likely above market price as a hotel due to the prospects of the apartment conversion and the current state of the hospitality industry. Therefore, on December 8, 2020, the Debtor entered into the SRE PSA with SRE for the sale of the Property. A copy of the SRE PSA is attached to the Statement of Facts as Exhibit "C."

As mentioned, SRE intends to acquire the Property pursuant to the SRE PSA and thereafter convert the Property into apartments, which is a permitted use under the current zoning classification applicable to the Property. However, it is necessary for SRE to obtain certain approvals relating to the change of use from the City of Scottsdale's Design Review Board (including with respect to compliance with architectural and construction requirements) (collectively, the "Rezoning and Change of Use Approval"). Indeed, SRE has been working with the City of Scottsdale with respect to the Rezoning and Change of Use Approval for several months, and has expended at least between $75,000.00 and

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

$100,000.00 in connection with obtaining the Rezoning and Change of Use Approval.

Although obtaining the Rezoning and Change of Use Approval has delayed the closing of the sale of the Property pursuant to the SRE PSA, SRE is confident that it will timely obtain the necessary Rezoning and Change of Use Approval and will be in a position to close the sale of the Property in or before January 2022.

SRE is aware of the Debtor's entry into the Endeavors Contract, discussed below, and remains committed to continuing the process of obtaining the Rezoning and Change of Use Approval and pursuing the purchase of the Property pursuant to the existing terms of the SRE PSA. The Endeavors Contract, and the Debtor's use of the Property as provided thereunder, has no impact on SRE's commitment to pursue the closing of the sale pursuant to the terms of the SRE PSA. Further, as discussed, the Debtor and Endeavors have agreed to extend the Endeavors Contract through December 31, 2021. SRE has consented to this extension, and to the assignment of the Endeavors Contract to SRE in the event the sale to SRE closes prior to the extended term of the Endeavors Contract. As consideration for SRE's consent in this regard, the Debtor has agreed to extend the deadline by which SRE must obtain the Rezoning and Change of Use Approval from September 30, 2021 to November 30, 2021, without SRE having to provide an additional security deposit to the Debtor.

SRE has the financial wherewithal and ability to pay the Purchase Price to consummate the purchase of the Property pursuant to the SRE PSA. SRE is wholly unrelated to the Debtor. The SRE PSA was negotiated at arms length, pre-petition, by the parties, both of whom were represented by highly competent counsel.

F.    The Endeavors Contract

In early May 2021, the Debtor was approached by Endeavors about the possibility of utilizing the hotel as an emergency family staging center ("EFSC") pursuant to Endeavors' contract with the Department of Homeland Security, U.S. Immigration and Customs Enforcement (*i.e.*, the Government) (the "Primary Contract") whereby Endeavors is to provide temporary shelter and other related services in a safe and secure environment for

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

non-citizen families. Endeavors is a Texas-based non-profit organization that provides services to vulnerable people in times of crisis. Endeavors operates three other EFCS facilities in Texas and one in Phoenix. The Statement of Facts, which is incorporated herein, provides detailed information concerning Endeavors' mission and services.

Since the Debtor was operating the Property as an independent, un-flagged hotel, and was laboring to generate sufficient cash flow to pay for operations due to decreased demand on account of the continuing COVID crisis, the Debtor determined, in its best business judgment, that entering into the Endeavors Contract to generate significant cash flow pending the sale of the Property to SRE was in its, and its creditors', best interests.

Indeed, prior to entering into the Endeavors Contract, the Debtor investigated Endeavors and its operations, and confirmed, through conversations with Endeavors and otherwise, among other things, that:

 a. The maximum number of people that were anticipated to be housed at the Property at any given time is approximately 200 or fewer people, because there are only a total of approximately 151 beds at the Property (in addition to beds, some rooms can accommodate cribs and roll-aways, depending on the size and configuration of the family)[3];

 b. Endeavors is required to comply with all local, state, and federal laws, including occupancy restrictions and fire code requirements;

 c. Each length of stay for residents is limited to no longer than 120 hours, with a preferred and aimed length of stay of less than 72 hours;

---

[3] In pleadings filed in the State Court Action, the Lender erroneously alleged that, under the Endeavors Contract, Endeavors could house as many as 1,200 people at the Property at time. However, the reference to "1,200 residents" is contained in "Attachment A" to the Endeavors Contract. Attachment A to the Endeavors Contract is an overview of the "Scope of Work" under the Primary Contract between Endeavors and the Government. Pursuant to the Primary Contract, Endeavors is authorized to provide shelter for up to 1,200 residents in all of its facilities, combined. The Endeavors Contract between Endeavors and the Debtor does not provide for the Property to accommodate 1,200 people. Indeed, since the Property only has approximately 151 beds, it would be logistically and legally impossible for the Property to house 1,200 people at a time. **To be clear, Endeavors has not housed, and will not house, 1,200 people at the Property at a time, and the Endeavors Contract does not provide for the housing of 1,200 people at a time at the Property.** The **maximum** number of people that will be housed at the Property at any given time will be no more than approximately 200 people.

d.	In fact, Endeavors does not house a family for longer than 72 hours unless a family member has tested positive for COVID, then the maximum length of stay is 120 hours;

e.	The average length of stay in Endeavors' other ECFS facilities is approximately 50 hours and, in the Phoenix facility, is approximately 47 hours;

f.	The Property will not house single adults and will not house unaccompanied children;

g.	The Property will only house families, and the average family size is approximately five people;

h.	All residents of the Property will be pre-screened by the Government and none will have a criminal history;

i.	Endeavors will provide case management services, food, transportation to and from the Property, medical care, clothing, and other life-essentials to the residents during their stay at the Property;

j.	Endeavors' staff will be on-site 24 hours per day, 7 days per week and will provide medical personnel and unarmed security for the residents;

k.	Residents will not be allowed to leave the Property during their brief stay;

l.	The Debtor's housekeeping, maintenance and administrative staff will, subject to completing background checks, remain employed by the Debtor and will continue to provide services to the residents and the Property;

m.	All pick-ups and drop-offs of residents are coordinated with, and fully monitored by, the Government; and

n.	Endeavors treats the residents with humanity, dignity, and respect while they are ushered through the immigration process.

Endeavors took possession of the Property on May 23, 2021. Since Endeavors started using the Property, Endeavors has confirmed that it has only housed families at the Property and that all residents have been screened for COVID. Generally, the average length of stay for residents has been approximately 53 hours; as of approximately September 20, 2021, the total number of families that have been housed at the Property is approximately 1,633, and the total number of individuals that have been housed at the Property since May 23, 2021 is approximately 4,948; the average number of people per day housed at the Property has been approximately 13 families (consisting of 39 individuals); and there have been no adverse issues or incidents at the Property.

The Endeavors Contract is financially beneficial to the Debtor. Specifically, the

Endeavors Contract provides for funding to the Debtor of up to $1,336,593 for the original four month period governed by the Endeavors Contract (*i.e.* from May 23, 2021 to September 30, 2021) and up to an additional $933,432 for the extended period (*i.e.*, from September 30, 2021 through December 31, 2021). Pursuant to the payment formula in the Endeavors Contract, the Debtor will receive an average of approximately $316,000 of revenue per month.

The term of the Endeavors Contract, as extended, is such that it allows the Debtor to generate revenue while SRE completes its discussions with the City of Scottsdale regarding the Rezoning and Change of Use Approval and, potentially, until the sale to SRE is consummated.

Further, the Endeavors Contract provides that "[Endeavors] shall at its sole expense maintain the property in good operating order, repair, condition, and appearance other than normal wear and tear, acts of God, and natural disasters and at all times during the Term otherwise keep the facility described in Attachment C (known as the Suites on Scottsdale in Scottsdale, Arizona (the 'Property') in Eligible Condition. [Endeavors] shall also surrender the property in good repair." *See* Modification at § H.40.

Although the Endeavors Contract provides that it may be terminated upon the filing of bankruptcy by the Debtor, Endeavors has confirmed to the Debtor that it has elected not to terminate the Endeavors Contract but, rather, supports the Debtor's assumption of the Endeavors Contract.

Endeavors has informed the Debtor that, prior to accepting residents at the Property, Endeavors spoke with the Assistant City Manager for the City of Scottsdale and confirmed that the City of Scottsdale has no zoning or other legal restrictions for the operation of the Property as an EFSC pursuant to the Endeavors Contract.

Given the multitude of financial benefits to the Debtor, the fact that entry into the Endeavors Contract would have no impact on the sale of the Property to SRE, and the assurances that the Property will be properly maintained during, and surrendered in good repair following, the term of the Endeavors Contract, the Debtor determined that it was in

its best interests, and the best interests of the Debtor's creditors, to enter into the Endeavors Contract. Accordingly, on May 13, 2021, the Debtor entered into the Endeavors Contract. A copy of the Endeavors Contract is attached to the Statement of Facts as Exhibit "D."

## IV. INCIDENTS WHICH LED TO THE FILING OF THE CHAPTER 11 CASE

Despite the existence of an equity cushion of approximately 88% (*i.e.* a value of approximately $8.2 million over and above the asserted amount of the Loan), prior to the Petition Date, the Lender initiated an action in the Maricopa County Superior Court ("State Court") seeking the appointment of a receiver over the Property and the issuance of a temporary restraining order ("TRO") to prevent the Debtor's use of the Property pursuant to the terms of the Endeavors Contract (the "State Court Action"). Additionally, the Lender noticed a Trustee's Sale of the Property for July 27, 2021. The State Court set an evidentiary hearing regarding the TRO for May 26, 2021, and an evidentiary hearing regarding the Lender's request for the appointment of a receiver for June 9, 2021.

To avoid the costs associated with defending the State Court Action, to prevent the Trustee's Sale of the Property, and to prevent the loss of approximately $8.2 million in value that can and will be used to, among other things, pay other financial obligations of the Debtor, the Debtor filed its bankruptcy petition on the Petition Date.

## V. THE DEBTOR'S ASSETS AND LIABILITIES

### A. The Debtor's Assets

#### 1. Property

The Debtor owns the Property and the Personal Property used in connection with the operation of the Property. As demonstrated by the Purchase Price in the SRE PSA, the value of the Property is at least $17.5 million. In fact, post-petition, the Debtor has received significant interest by other parties for the purchase of the Property which has confirmed that the Purchase Price is a fair representation of the value of the Property.

#### 2. Other Personal Property

##### a. Bank Accounts

As of the Petition Date, the Debtor held approximately $32,000 in various bank

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

accounts. Of this amount, approximately $10,386 was held by Canyon and these funds were used by the Debtor, post-petition and pursuant to a Court order, to pay pre-petition payroll to the Debtor's employees. The other funds have been used in the ordinary course of the Debtor's business to pay for the Debtor's operations. The Debtor has accumulated about $232,000 in net cash, after paying operating expenses. These funds are held in the Debtor's debtor-in-possession accounts.[4]

### b.    Vehicles

The Debtor owns a 2018 Mercedes-Benz van.

### c.    Accounts Receivable

As of the Petition Date, the Debtor was owed approximately $1,670,000 from a related entity, Santa Fe Hospitality, LLC ("Santa Fe"). The Debtor does not believe that this receivable is collectable from Santa Fe.

### d.    Cause of Action

The Debtor believes that it may have certain causes of action against AHI and its affiliates, representatives and principals for their mismanagement with respect to the unpaid TPT taxes. The Debtor filed a complaint against AHI in Maricopa County Superior Court prior to the Petition Date and is assessing whether to pursue that action.

## B.    The Debtor's Liabilities

By Order of the Bankruptcy Court (Dkt. No. 106), the deadline for all non-governmental employees to file proofs of claim was August 30, 2021 (the "Claims Deadline"). The Debtor's pre-petition liabilities are discussed in detail above.

Additionally, the Debtor has incurred post-petition attorney's fees and costs which will constitute administrative priority claims against the Debtor's bankruptcy Estate. The Debtor's counsel estimates that the total amount of its attorney's fees and costs through the Confirmation Date will be between $200,000 and $250,000. Debtor's counsel currently

---

[4] According to the Debtors' records, through April 2021, Wilmington Trust held approximately $1.469 million in reserve funds supplied by the Debtor. It appears that Wilmington Trust may have applied these reserves to its claim.

holds approximately $60,000 on deposit from its pre-petition retainer that will be applied its fees and costs.

## VI. SIGNIFICANT EVENTS DURING THE CHAPTER 11 CASE

### A. The Bankruptcy Filing and First Meeting of Creditors

The Debtor filed its voluntary petition for relief under Chapter 11 of the Bankruptcy Code on May 26, 2021 (*i.e.* the Petition Date), and a first meeting of creditors was commenced and completed on June 29, 2021.

### B. Schedules and Amendments

The Debtor initially filed its Schedules of Assets and Liabilities and Statement of Financial Affairs ("Schedules") on June 16, 2021 [Dkt. No. 86] and amended the Schedules on June 28, 2021 [Dkt. No. 117].

### C. Debtor's Retention of Professionals

Prior to the Petition Date, the Debtor retained Sacks Tierney, P.A. ("ST") to act as its bankruptcy counsel. The Court signed an order approving the Debtor's retention of ST on July 2, 2021 [Dkt No. 126].

### D. Approval to Use Cash Collateral

At the Debtor's request [Dkt. No. 68], the Court authorized the Debtor to use the funds in the Canyon bank account, that constituted Canyon's cash collateral, to pay the Debtor's payroll. [Dkt. No. 99].

Also at the Debtor's request [Dkt. No. 37] and, over Wilmington Trust's objections [Dkt. Nos. 14, 29, 56, and 108], the Court has authorized the Debtor to use cash collateral to pay its ordinary and necessary operating expenses through September 29, 2021. [Dkt. No. 128]. Pursuant to the Court's order authorizing the use of cash collateral, the Debtor is required to pay, and has paid, adequate protection payments to Wilmington Trust in the amount of $80,000 per month. The parties have reserved their respective rights with respect to how the adequate protection payments will be applied to Wilmington Trust's claim

The Debtor intends to seek authority to continue using cash collateral through, at least, December 31, 2021.

### E. Approval of DIP Financing

At the Debtor's request [Dkt. No. 35] and over Wilmington Trust's objections [Dkt. No. 56], the Court authorized the Debtor to obtain post-petition financing from its Owners up to $150,000 to allow the Debtor to pay certain operating expenses of the Debtor, including certain critical vendors. [Dkt. Nos. 98 and 127].

### F. Approval to Pay Critical Vendors

At the Debtor's request [Dkt. No. 39] and over Wilmington Trust's objections [Dkt. No. 56], the Court authorized the Debtor to pay certain pre-petition Claims of certain critical vendors. [Dkt. No. 100].

### G. Motion to Sell the Property

The Debtor filed a motion for authority to sell the Property to SRE pursuant to the SRE PSA (the "Sale Motion"). [Dkt. No. 41]. Wilmington Trust and Maxim objected to the Sale Motion. [Dkt. Nos. 122 and 129, respectively]. The Court has set a hearing to consider the Sale Motion for October 19 at 10:00 a.m.

### H. Motion to Retain Ledgestone

The Debtor filed a motion for authority to retain Ledgestone to manage and operate the Property (the "Ledgestone Motion"). [Dkt. No. 44]. Wilmington Trust and the US Trustee objected to the Ledgestone Motion. [Dkt. Nos. 90 and 97, respectively]. The Court has set a hearing to consider the Ledgestone Motion for October 19 at 10:00 a.m.

### I. Motion to Assume Endeavors Contract

The Debtor filed a motion to assume the Endeavors Contract (the "Endeavors Motion"). [Dkt. No. 43]. Wilmington Trust objected to the Endeavors Motion. [Dkt. No. 130]. The Court has set a hearing to consider the Endeavors Motion for October 19 at 10:00 a.m.

## VII. PLAN SUMMARY

The following is a summary of the Plan. You are encouraged to review the Plan in its entirety. In the event of any inconsistencies between this Disclosure Statement and the Plan will be governed by the Plan.

## VIII.  OVERVIEW OF THE PLAN

The Debtor intends to sell its Property to SRE, pursuant to the pre-petition SRE PSA, for the purchase price of $17.5 million.[5] If the sale to SRE does not close for any reason, then the Debtor intends to sell the Property pursuant to a Court-supervised Auction after an appropriate Bid Solicitation Period. The Debtor, in its sole and exclusive discretion, may operate the Property as an independent hotel during any gap period between the termination of the SRE PSA, if any, and the closing of a Sale following the Auction. The Debtor intends to use the Sale Proceeds, and any remaining Cash-on-Hand following the Sale, to pay all Allowed Claims, in full and with interest, and to distribute any Excess Sale Proceeds to holders of Allowed Interests.

In the event that the Sale Proceeds are insufficient to pay all Allowed Claims, in full and with interest, then a Litigation Agent will be appointed to analyze and, if appropriate, pursue claims of the Estate against third parties. Any Litigation Proceeds recovered by the Litigation Agent will be distributed to Allowed Claims in their order of priority as set forth herein.

## IX.  CLASSIFICATION OF CLAIMS AND INTERESTS

A.  **General Classification Provisions**.  For purposes of organization, voting, and all confirmation matters, except as otherwise provided herein, all Claims and Interests shall be classified as set forth in this article of the Plan.  However, a Claim or Interest will be deemed classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of the Claim or Interest qualifies within the description of such different Class.  As of the Confirmation Hearing, any Class of Claims that does not contain any Creditor's Claim will be deemed deleted automatically from the Plan; and any Class of Claims that does not contain an Allowed Claim (or a Claim temporarily or provisionally allowed by the Bankruptcy Court for voting purposes) will be deemed automatically deleted from the Plan with respect to voting on confirmation of the

---

[5] The Sale to SRE pursuant to the SRE PSA may occur prior to confirmation of this Plan.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

Plan. A Claim or Interest is in a particular Class only to the extent the Claim or Interest is an Allowed Claim or Allowed Interest as defined herein.

**B.** **Classification of Claims and Interests.** The Plan classifies Claims and Interests in various Classes according to their right to priority of payments as provided under the Bankruptcy Code. The Plan states whether each Class of Claims or Interests are impaired or unimpaired. The Plan provides the treatment that each Class will receive under the Plan.

**C.** **Voting Requirements for Acceptance or Rejection of the Plan**

The Bankruptcy Court will confirm the Plan if the requirements of Bankruptcy Code are satisfied. The Bankruptcy Court will determine whether the Plan has been accepted by each impaired class entitled to vote on the Plan. Impaired classes entitled to vote on the Plan are those classes of claims whose legal, equitable, or contractual rights are altered, as provided in § 1124. A class of Claims that is not impaired is deemed to have accepted the Plan and is Claimants in such Class are not entitled to vote on the Plan.

An impaired class of Claims is deemed to have accepted the Plan if Claimants holding at least two thirds (2/3) of the dollar amount of those Claims who vote, and more than one half (1/2) in number of those Claims who vote, have accepted the Plan. An impaired class of Interests is deemed to have accepted the Plan if the Plan has been accepted by at least two thirds (2/3) in amount of the Allowed Interests who vote on the Plan. Only the votes of those Creditors or Interest Holders whose ballots are timely received will be counted in determining whether a class has accepted the Plan.

The Allowed Claims and Interests against the Debtor's Estate are divided into the following classes

**D.** **Class 1: Allowed Administrative and Allowed Priority Claims**

    **1.** Class 1-A: Allowed Administrative Claims.

    **2.** Class 1-B: Allowed Priority Tax Claims.

**E.** **Class 2: Allowed Secured Claims**

    **1.** Class 2-A: Allowed Secured Claim of Wilmington Trust.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

**2.** Class 2-B: Allowed Secured Claim of Maxim.

**3.** Class 2-C: Allowed Secured Claim of the SBA.

**4.** Class 2-D: Allowed Secured Claim of Patel.

**5.** Class 2-E: Allowed Secured Claim of Hundal.

**F.** <u>**Class 3: Allowed Unsecured Claims**</u>

**G.** <u>**Class 4: Allowed Interests**</u>

**X. IMPAIRMENT OF CLASSES**

Class 1-A is unimpaired under the Plan. All other Classes are impaired, as that term is defined in § 1124.

**XI. TREATMENT OF CLASSES**

**A.** <u>**Class 1: Allowed Administrative and Allowed Priority Claims**</u>

**1. Class 1-A: Allowed Administrative Claims**

Class 1-A consists of Allowed Administrative Claims under §§ 503 and 507(a)(2). Class 1-A includes Claims for compensation of professional persons (including attorneys), authorized fees payable to the Trustee, court fees, expenses of administration, post-petition operating expenses due and unpaid at the time of Confirmation, and actual and necessary costs of preserving the estate.

Any Allowed Administrative Claims incurred in the ordinary course of the Debtor's operations will be paid in accordance with the terms established by the Debtor and the implicated Claimant.

Unless other Claimants holding Claims in this Class agree to an alternative form of treatment, the Allowed Administrative Claims of Class 1-A shall be paid in full, from the Reorganized Debtor's Cash-on-Hand, on or before the later to occur of (a) the 30th day following the Confirmation Date and (b) five business days from the date such Administrative Clam is Allowed by the Court. Any Class 1-A Administrative Claim that is not Allowed as of the Confirmation Date shall be paid in full as provided herein, but shall only receive payments from the Reorganized Debtor upon the Allowance of the Administrative Claim by the Court. Until such time as an Administrative Claim is Allowed,

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

the Reorganized Debtor shall hold and sequester such Claimant's pro rata share of the payments to Allowed Administrative Claimants.

This Class is unimpaired.

### 2.    Class 1-B:  Allowed Priority Tax Claims

Class 1-B consists of Allowed Priority Claims under § 507(a)(8), including the ADOR's Allowed Priority Claim. Allowed Claims in this Class shall continue to accrue interest and penalties at the applicable statutory rate for such claims until such time as they are paid in full. Unless they agree to an alternative form of treatment, Claimants holding Allowed Priority Claims in this Class will be paid, in full, on the Effective Date from the Sale Proceeds after payments to, and/or reserves for, the Claimants holding Secured Claims in Classes 2-A, 2-B and 2-C, as provided below. Any Class 1-B Claims that are not Allowed as of the Effective Date shall be paid, in full, as soon thereafter as they are Allowed by the Court.

In the event that the Sale Proceeds are insufficient to pay the full amount of the Allowed Secured Claims in Classes 2-A, 2-B and 2-C and the Allowed Priority Claims in this Class, then any unpaid portion of the Allowed Priority Claims in this Class 1-B will be paid, pro rata, from the Litigation Proceeds, if any, prior to payment of any other unpaid Allowed Claims until all Allowed Priority Claims in this Class 1-B are paid in full.

This Class is impaired.

### B.    Class 2:  Allowed Secured Claims

### 1.    Class 2-A – Allowed Secured Claim of Wilmington Trust

Class 2-A consists of the Allowed Secured Claim of Wilmington Trust. Wilmington Trust asserts that the amount of its Secured Claim against the Debtor is $9,345,311.88 as of the Petition Date, and that its Claim is secured by a first-position lien encumbering the Property.

The Debtor disputes the asserted amount of Wilmington Trust's Claim and, unless the parties reach an agreement regarding the amount of Wilmington Trust's Allowed Secured Claim, the Debtor intends to object to the allowance of portions of the Wilmington

Trust asserted Claim. The amount of Wilmington Trust's Allowed Secured Claim will ultimately be determined either through an agreement of the parties or by a Final Order of the Court.

Wilmington Trust will retain its first position lien on the Property until such time as the Property is sold as provided herein. Upon the Sale of the Property as provided herein, Wilmington Trust's lien encumbering the Property shall be deemed to be satisfied, extinguished, released and discharged as against the Property, and shall attach to the Sale Proceeds but only to the extent of either (a) the amount of Wilmington Trust's Allowed Secured Claim, if such amount has been finally determined as of the consummation of the Sale, or (b) the asserted amount of Wilmington Trust's Claim, as set forth in Wilmington Trust's Proof of Claim, plus post-petition interest at a rate, and other charges in an amount, to be determined by the Court or agreed to by the parties (the "WT Asserted Claim"). Any amount of Sale Proceeds in excess of the Wilmington Trust Allowed Secured Claim (if such amount has been finally determined as of the consummation of the Sale) or the WT Asserted Claim (if the amount of the Wilmington Trust Allowed Secured Claim has not been finally determined as of the consummation of the Sale), will be free and clear of Wilmington Trust's lien, and will be available for distribution to pay other Allowed Claims and/or Allowed Interests as provided in this Plan.

On the later to occur of (a) the Effective Date and (b) the date on which the Wilmington Trust Allowed Secured Claim is finally determined either by agreement of the parties or a Final Order of the Court, the Reorganized Debtor will pay the Wilmington Trust Allowed Secured Claim, in full, from (i) any remaining Cash-on-Hand after full payment of all Allowed Administrative Claims and (ii) the Sale Proceeds.

Notwithstanding the foregoing, the Reorganized Debtor may, in its sole and absolute discretion, pay any undisputed portion of the WT Asserted Claim from the Sale Proceeds and/or remaining Cash-on-Hand prior to a final determination of the Wilmington Trust Allowed Secured Claim, with such payment being applied to the Wilmington Trust Allowed Secured Claim in a manner determined by the Reorganized Debtor in its sole and

absolute discretion.

Immediately upon payment in full of the Wilmington Trust Allowed Secured Claim, all of Wilmington Trust's liens and security interests in the Sale Proceeds (or in any and all other property or assets owned by the Debtor or the Reorganized Debtor) will be deemed satisfied, extinguished, released, and discharged in full.

In the event that the Sale Proceeds are insufficient to pay the full amount of the Wilmington Trust Allowed Secured Claim, then any unpaid portion of Wilmington Trust's Allowed Claim shall be treated as an Allowed Unsecured Claim under Class 3.

This Class is impaired.

## 2. Class 2-B – Allowed Secured Claim of Maxim

Class 2-B consists of the Allowed Secured Claim of Maxim. Maxim asserts that the amount of its Secured Claim against the Debtor is $1,417,192.20 as of the Petition Date, and that its Claim is secured by a second position lien encumbering the Property.

The Debtor disputes the asserted amount of Maxim's Claim and, unless the parties reach an agreement regarding the amount of Maxim's Allowed Secured Claim, the Debtor intends to object to the allowance of portions of the Maxim asserted Claim. The amount of Maxim's Allowed Secured Claim will ultimately be determined either through an agreement of the parties or by a Final Order of the Court.

Maxim will retain its second position lien on the Property until such time as the Property is sold as provided herein. Upon the Sale of the Property as provided herein, Maxim's lien encumbering the Property shall be deemed to be satisfied, extinguished, released and discharged as against the Property, and shall attach to the Sale Proceeds but only to the extent of (a) the amount of Maxim's Allowed Secured Claim, if such amount has been finally determined as of the consummation of the Sale, or (b) the asserted amount of Maxim's Claim, as set forth in Maxim's Proof of Claim plus post-petition interest at a rate, and other charges in an amount, to be determined by the Court or agreed to by the parties (the "Maxim Asserted Claim"). Any amount of Sale Proceeds in excess of (i) the Wilmington Trust Allowed Secured Claim (if such amount has been finally determined as

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

of the consummation of the Sale) or the WT Asserted Claim (if the amount of the Wilmington Trust Allowed Secured Claim has not been finally determined as of the consummation of the Sale) **plus** (ii) the Maxim Allowed Secured Claim (if such amount has been finally determined as of the consummation of the Sale) or the Maxim Asserted Claim (if the amount of the Maxim Allowed Secured Claim has not been finally determined as of the consummation of the Sale), will be free and clear of Maxim's lien, and will be available for distribution to pay other Allowed Claims and/or Allowed Interests as provided in this Plan.

The Reorganized Debtor will pay the Maxim Allowed Secured Claim, in full, from the Sale Proceeds, on the later to occur of (a) the Effective Date and (b) the date on which the Maxim Allowed Secured Claim is finally determined either by agreement of the parties or a Final Order of the Court. Notwithstanding the foregoing, the Reorganized Debtor may, in its sole and absolute discretion, pay any undisputed portion of the Maxim Asserted Claim from the Sale Proceeds prior to a final determination of the Maxim Allowed Secured Claim with such payment being applied to the Maxim Allowed Secured Claim in a manner determined by the Reorganized Debtor in its sole and absolute discretion.

Immediately upon payment in full of the Maxim Allowed Secured Claim, all of Maxim's liens and security interests in the Sale Proceeds (or in any and all other property or assets owned by the Debtor or the Reorganized Debtor) will be deemed satisfied, extinguished, released, and discharged in full.

In the event that the Sale Proceeds are insufficient to pay the full amount of the Maxim Allowed Secured Claim, then any unpaid portion of Maxim's Allowed Claim shall be treated as an Allowed Unsecured Claim under Class 3.

This Class is impaired.

### 3. Class 2-C – Allowed Secured Claim of the SBA

Class 2-C consists of the Allowed Secured Claim of the SBA. The SBA asserts that the amount of its Secured Claim against the Debtor is $155,301.37 as of the Petition Date, and that its Claim is secured by a third position lien encumbering the Personal Property.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

The SBA will retain its third position lien on the Personal Property until such time as the Personal Property is sold as provided herein. Upon the Sale of the Personal Property as provided herein, the SBA's lien encumbering the Personal Property shall be deemed to be satisfied, extinguished, released and discharged as against the Personal Property, and shall attach to the Sale Proceeds but only to the extent of the amount of the SBA's Allowed Secured Claim. Any amount of Sale Proceeds in excess of (i) the Wilmington Trust Allowed Secured Claim (if such amount has been finally determined as of the consummation of the Sale) or the WT Asserted Claim (if the amount of the Wilmington Trust Allowed Secured Claim has not been finally determined as of the consummation of the Sale) *plus* (ii) the Maxim Allowed Secured Claim (if such amount has been finally determined as of the consummation of the Sale) or the Maxim Asserted Claim (if the amount of the Maxim Allowed Secured Claim has not been finally determined as of the consummation of the Sale) *plus* (iii) the SBA's Allowed Secured Claim, will be free and clear of the SBA's lien, and will be available for distribution to pay other Allowed Claims and/or Allowed Interests as provided in this Plan.

The Reorganized Debtor will pay the SBA's Allowed Secured Claim, in full, from the Sale Proceeds on the Effective Date.

Immediately upon payment in full of the SBA's Allowed Secured Claim, all of the SBA's liens and security interests in the Sale Proceeds (or in any and all other property or assets owned by the Debtor or the Reorganized Debtor) will be deemed satisfied, extinguished, released, and discharged in full.

In the event that the Sale Proceeds are insufficient to pay the full amount of the SBA's Allowed Secured Claim, then any unpaid portion of the SBA's Allowed Claim shall be treated as an Allowed Unsecured Claim under Class 3.

This Class is impaired.

### 4. Class 2-D – Allowed Secured Claim of Patel

Class 2-D consists of the Allowed Secured Claim of Patel in the amount of $5,623.57 which is secured by a purchase money security interest encumbering certain

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

3120052.v1

Personal Property used in the operation of the Property. The Patel Allowed Secured Claim will be paid, with post-petition interest at the Plan Rate, on or before the 14th day following the Confirmation Date. Immediately upon payment in full of Patel's Allowed Secured Claim, all of Patel's liens and security interests in any of the Debtor's property or assets will be deemed satisfied, extinguished, released, and discharged in full.

This Class is impaired.

### 5. Class 2-E – Allowed Secured Claim of Hundal

Class 2-E consists of the Allowed Secured Claim of Hundal in the amount of $5,623.57 which is secured by a purchase money security interest encumbering certain Personal Property used in the operation of the Property. The Hundal Allowed Secured Claim will be paid, with post-petition interest at the Plan Rate, on or before the 14th day following the Confirmation Date. Immediately upon payment in full of Hundal's Allowed Secured Claim, all of Hundal's liens and security interests in any of the Debtor's property or assets will be deemed satisfied, extinguished, released, and discharged in full.

This Class is impaired.

### C.   Class 3:  Allowed Unsecured Claims

Class 3 consists of all Allowed Unsecured Claims that are not otherwise classified in the Plan. Unless they agree to an alternative form of treatment, Claimants holding Allowed Unsecured Claims in this Class will be paid, in full with post-petition interest at the Plan Rate, on the Effective Date from the Sale Proceeds, after payments to, and/or reserves for, the Claimants in Classes 2-A, 2-B and 2-C as provided above, and after payment, in full with interest at the applicable statutory rate, of Allowed Priority Claims in Class 1-B.

In the event that the Sale Proceeds are insufficient to pay the full amount of the Allowed Secured Claims in Classes 2-A, 2-B and 2-C and the Allowed Priority Claims in Class 1-B, then Allowed Unsecured Claims in this Class will be paid, *pro rata*, from any amounts remaining from the Litigation Proceeds, if any, after Allowed Priority Claims in Class 1-B are paid in full with interest at the applicable statutory rate for such claims.

This Class is impaired.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693

**D.** **Class 4: Allowed Interests**

Class 5 consists of the Allowed Interests in the Debtor.

Any and all remaining Sale Proceeds after payment of all Allowed Claims, in full with interest as provided in the Plan (the "Excess Sale Proceeds"), shall be distributed, in equal parts, to the Interest Holders to be used in their sole and absolute discretion. It is currently contemplated that the Interest Holders, to defray adverse tax consequences, will invest the Excess Sale Proceeds into a Section 1031 exchange and that the Excess Sale Proceeds will remain in escrow pending the consummation of the Section 1031 Exchange.

In addition, on or before the 14th day following the Confirmation Date, the Vehicle Leases will be assigned to the Interest Holders who will take over payments to the lessors under the Vehicle Leases

In the event that the Sale Proceeds are sufficient to pay all Allowed Claims in full, then on the Effective Date, title the Mercedes-Benz Van will be transferred to the Interest Holders.

In the event that the Sale Proceeds are insufficient to pay all Allowed Claims in full with interest, and the Litigation Agent recovers Litigation Proceeds sufficient to pay Allowed Claims in full with interest, then any remaining Litigation Proceeds after such payment of Allowed Claims in full shall be distributed, in equal parts, to the Interest Holders to be used in their sole and absolute discretion.

In the event that the Sale Proceeds and the Litigation Proceeds, if any, are insufficient to pay all Allowed Claims in full with interest, then (a) the Mercedes-Benz Van will be liquidated and the proceeds shall be added to the Litigation Proceeds for distribution to Allowed Claimants and (b) the Interest Holders will not recover anything on account of their Interests.

**XII. MEANS FOR EXECUTING THE PLAN**

**A.** **Sale to SRE Pursuant to the SRE PSA and the Sale Motion**

The Debtor intends to sell the Property to SRE pursuant to the SRE PSA. To that end, the Debtor has filed, and will continue to seek approval of, the separate Sale Motion

requesting authority to sell the Property to SRE pursuant to the SRE PSA. The Debtor reserves the right to amend or modify the SRE PSA in its sole and absolute discretion *provided, however,* that any such amendment or modification shall not (a) reduce the purchase price to an amount less than the amount of all *asserted* Claims against the Debtor or (b) extend the SRE Closing Deadline, unless such extension is approved by Wilmington Trust in writing.

To the extent that the SRE Sale Order has not been entered prior to confirmation of the Plan, then the Sale Motion is incorporated herein by this reference. If the SRE Sale Order has been entered prior to the confirmation of the Plan, then the SRE Sale Order is incorporated herein by this reference.

Pursuant to the 2nd Amendment to the SRE PSA, to the extent that the Endeavors Contract has not expired by its own terms or been terminated by either the Debtor or Endeavors prior to the consummation of the Sale to SRE, then the Debtor will assume and assign the Endeavors Contract to SRE, and SRE and Endeavors will both accept and approve of such assignment.

This Plan and the Confirmation Order will govern the distribution of Sale Proceeds following consummation of the Sale.

### B. <u>Alternative Auction Sale</u>

Pursuant to the SRE PSA, SRE has until November 30, 2021 (the "Zoning Contingency Deadline') to either (a) obtain the Rezoning and Change of Use Approvals from the Governmental Authorities or (b) waive the Zoning Contingency. Pursuant to the SRE PSA, SRE must close is purchase of the Property and pay the $17.5 million purchase price with forty-five (45) days of the Zoning Contingency Deadline—*i.e.*, the SRE Closing Deadline of January 14, 2022.

If SRE does not obtain the Rezoning and Change of Use Approvals from the Governmental Authorities, or waive the Zoning Contingency, by the Zoning Contingency Deadline, and the Zoning Contingency Deadline has not been extended by written consent of the Debtor and Wilmington Trust, then the Debtor shall terminate the SRE PSA as of the

day following the Zoning Contingency Deadline.

If the SRE PSA is terminated, at any time, by either SRE or the Debtor, and SRE does not consummate the purchase of the Property pursuant to the SRE PSA, then for a period of 30 days from the Termination Date (the "Bid Solicitation Period"), the Debtor will solicit bids and offers for the purchase of the Property. The Debtor may choose a stalking horse bidder, in its sole and absolute discretion. (The proposed Sale Procedures Order contemplates that there will be a stalking horse bidder; however, the Auction may proceed without a stalking horse bidder in the Debtor's sole discretion or if no potential bidders consent to such a role.)

Upon expiration of the Bid Solicitation Period, the Debtor will submit the Sale Procedures Order to the Court and request that the Court enter the Sale Procedures Order and set a date to conduct an Auction of the Property (the "Auction Sale Date") no sooner than 30 days and no later than 60 days from the submission of the Sale Procedures Order.

The Property will be sold to the highest and best bidder at the Auction pursuant to the terms of the Sale Procedures Order. Following the Auction, the Court will enter a Sale Order providing for the Sale of the Property to the highest and best bidder (the "Prevailing Bidder") free and clear of all liens, claims and encumbrances pursuant to § 363, with such liens, claims and encumbrances attaching to the Sale Proceeds as provided for in this Plan. The Sale Proceeds will be distributed pursuant to the terms of this Plan and the Confirmation Order.

To the extent that the Endeavors Contract has not expired by its own terms or been terminated by either the Debtor or Endeavors prior to the consummation of the Sale to the Prevailing Bidder, then the Debtor will assume and assign the Endeavors Contract to the Prevailing Bidder, and the Prevailing Bidder will accept such assignment so long as Endeavors consents to the assignment to the Prevailing Bidder.

### C. Debtor's Option to Operate the Property as a Hotel During any Pre-Sale Gap Period

In the event that the SRE PSA is terminated by either the Debtor or SRE, the Debtor may, in its sole and absolute discretion, operate the Property as an independent Hotel during

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

3120052.v1

the period between the Termination Date and the consummation of the Sale to the Prevailing Bidder. Additionally, in the event the Endeavors Contract expires or is terminated prior to the consummation of the Sale, the Debtor may, in its sole and absolute discretion, operate the Property as an independent Hotel until the Sale is consummated. The Debtor may use Cash-on-Hand to fund such operations, and any net revenues generated by such operations, after payment of ordinary and necessary operating expenses, shall be considered Cash-on-Hand and shall be used pursuant to the terms of this Plan.

### D. Post-Confirmation Management and Operations

Sukhbinder Khangura will be responsible for the management of the Reorganized Debtor after the Confirmation Date, and Ledgestone shall continue operating and managing the Property until a Sale is consummated. Ledgestone will continue to be compensated by the Reorganized Debtor pursuant to the terms of the Ledgestone Management Agreement.

### E. Disbursing Agent

The Reorganized Debtor will serve as its own Disbursing Agent and will make distributions to holders of Allowed Claims in accordance with the Plan.

### F. Documentation of Plan Implementation

In the event any holder of an Allowed Secured Claim or any other lien or security interest in any of the Debtor' assets for which the Plan requires the execution of any documents to incorporate the terms of the Plan, fails to provide a release of its lien or execute the necessary documents to satisfy the requirements of the Plan, the Reorganized Debtor may record or file a copy of this Plan, the Confirmation Order, the SRE Sale Order, and/or the Sale Order with the appropriate governmental agency and make the appropriate revisions in its records, and such recordation and revisions shall constitute the lien release and creation of any necessary new liens to satisfy the terms of the Plan. If the Reorganized Debtor deems advisable, it may also obtain a further Order from the Court that may be recorded in order to implement the terms of the Plan.

## XIII. EFFECT OF CONFIRMATION

Except as otherwise provided for in the Plan or the Confirmation Order,

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

3120052.v1

Confirmation of the Plan will discharge, effective as of the Confirmation Date, any and all debts of the Debtor that arose any time before the entry of the Confirmation Order including, but not limited to, all principal and all interest accrued thereon, pursuant to § 1141(d)(1). The discharge shall be effective as to each Claim, regardless of whether a proof of claim thereon was filed, whether the Claim is an Allowed Claim, or whether the holder thereof votes to accept the Plan.

## XIV. OBJECTIONS TO AND ESTIMATIONS OF CLAIMS

### A. Objections and Bar Date for Filing Objections

As soon as practicable, but in no event later than 90 days after the Confirmation Date, objections to Claims shall be filed with the Bankruptcy Court and served upon the holders of each of the Claims to which objections are made pursuant to the Bankruptcy Code and the Bankruptcy Rules.

### B. Settlement of Claims

The Reorganized Debtor may consummate settlements of Claims against the Estate using Cash-on-Hand or Sale Proceeds. Any settlement reached prior to the closure of the Debtor's Bankruptcy Case shall be subject to approval of the Bankruptcy Court. Subsequent to the Closure of the Debtor's Bankruptcy Case, the Debtor shall have the ability and discretion to negotiate and consummate the settlement of any Claim without approval of the Bankruptcy Court.

### C. Estimation of Claims

For purposes of calculating distributions provided for under the Plan, all Claims objected to shall be estimated by the Disbursing Agent at an amount equal to (i) the amount, if any, determined by the Court pursuant to § 502(c) as an estimate for distribution purposes; (ii) an amount agreed to between the Debtor and the Claimant; or (iii) any amount set forth as an estimate in the Plan. Notwithstanding anything herein to the contrary, no distributions shall be made on account of any Claim until such Claim is an Allowed Claim. Funds that would have otherwise been distributed to the holder of a Claim to which an objection was filed will be held by the Disbursing Agent until such time as that

3120052.v1

objection is adjudicated by the Court.

### D.  **Unclaimed Funds and Interest**

Distribution to Claimants shall be mailed by the Disbursing Agent to the Claimants at the address appearing on the Claimant's proof of claim, or, if no proof of claims was filed, the address included in master mailing matrix, unless the Claimant provides the Disbursing Agent with an alternate address.  For a period of one year from the date that a distribution was to be made by the Disbursing Agent but has gone uncollected by the Claimant, the Disbursing Agent shall retain any distributions otherwise distributable hereunder that remain unclaimed or as to which the Disbursing Agent has not received documents required pursuant to the Plan.  Thereafter, the unclaimed funds shall be deemed abandoned, the Claimant's Claim shall be deemed disallowed, and the unclaimed funds shall be vested in the Reorganized Debtor for use in a manner consistent with the terms of this Plan.

## XV.  NON-ALLOWANCE OF PENALTIES AND FINES

Except as expressly and specifically provided in the Plan, no distribution shall be made under this Plan on account of, and no Allowed Claim, whether Secured, Unsecured, Administrative, or Priority, shall include, any fine, penalty, exemplary or punitive damages, late charges, default interest, or other monetary charges relating to or arising from any default or breach by the Debtor, and any Claim on account thereof shall be deemed disallowed, whether or not an objection is filed.

## XVI.  CLOSING OF CASE

Until this Bankruptcy Case is officially closed, the Reorganized Debtor will be responsible for filing post-confirmation reports required by the United States Trustee. The Reorganized Debtor may move the Court to administratively close the Bankruptcy Cases, subject to reopening if and when entry of a discharge is appropriate.

## XVII. MODIFICATION OF THE PLAN

The Debtor may amend or modify this Plan at any time prior to Confirmation without leave of the Court.  The Reorganized Debtor may propose amendments and/or

modifications of this Plan at any time subsequent to Confirmation with leave of the Court and upon notice to Creditors. After Confirmation of the Plan, the Reorganized Debtor may, with approval of the Court, as long as it does not materially or adversely affect the interests of Creditors, remedy any defect or omission or reconcile any inconsistencies in the Plan, or in the Confirmation Order, if any may be necessary to carry out the purposes or intent of this Plan.

## XVIII.    JURISDICTION OF THE COURT

The Court will retain jurisdiction until this Plan has been fully consummated for, including but not limited to, the following purposes:

1. To enter, implement and enforce the Sale Procedures Order, conduct the Auction, and enter, implement and enforce the Sale Order.

2. To determine the classification of the Claims of any Creditors and the re-examination of any Claims that have been allowed for the purposes of voting, and for the determination of such objections as may be filed to the Creditor's Claims.

3. To determine any Claims that are disputed by the Debtor or the Reorganized Debtor, whether such objections are filed before or after Confirmation, and to estimate any Unliquidated or Contingent Claims pursuant to § 502(c)(1) upon request of the Debtor or any holder of a Contingent or Unliquidated Claim, and to make determinations regarding any objection to such Claim.

4. To determine all questions and disputes regarding title to the assets of the Estate, and to determine and adjudicate all causes of action, controversies, disputes, or conflicts, whether or not subject to action pending as of the date of Confirmation, between the Debtor and any other party, including but not limited to, any rights of the Debtor or the Reorganized Debtor to recover assets pursuant to the provisions of the Bankruptcy Code.

5. To correct any defect, cure any omission or make any reconciliation of any inconsistencies in this Plan, or the Confirmation Order, as may be necessary to carry out the purposes and intent of this Plan.

6. To address and approve any proposed modification of this Plan after

3120052.v1

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

Confirmation, pursuant to the Bankruptcy Rules and the Bankruptcy Code.

7. To enforce, interpret, and promote the effectuation of the terms and conditions of this Plan.

8. To enter any order, including injunctions, necessary to enforce the title, rights, and powers of the Debtor or the Reorganized Debtor, and to impose such limitations, restrictions, terms, and conditions of such title, right, and power that this Court may deem necessary.

9. To hear, determine, and resolve any disputes that may arise in connection with the Reorganized Debtor' efforts to market, manage, operate, finance, or sell any of the Debtor' property, and the manner in which any resulting proceeds are distributed.

10. To enter an order closing this Bankruptcy Case, and thereafter enter an order reopening this Bankruptcy Case.

11. To consider and adjudicate any request by the Reorganized Debtor for the entry of a discharge.

## XIX. RETENTION AND ENFORCEMENT OF CLAIMS

Pursuant to § 1123(b)(3), the Reorganized Debtor shall retain and may enforce any and all claims of the Debtor, except those claims specifically waived herein. The retained causes of action include, but are not limited to, any and all avoidance actions, fraudulent conveyance actions, preference actions, and other claims and causes of action of every kind and nature whatsoever, arising before the Confirmation Date that have not been resolved or disposed of prior to the Confirmation Date, whether or not such claims or causes of action are specifically identified in this Plan. Except as expressly set forth herein, the Debtor does not intend to waive or relinquish any cause of action by way of this Plan, and reserves the right to file a supplement to the Plan prior to Confirmation describing any causes of action the Debtor desires to specifically identify prior to Confirmation.

The Debtor specifically identifies, and reserves the right to pursue, any and all claims it has or may have against American Hospitality Inc., LLC, Loren Benjamin, Joe Benjamin and/or any of their affiliates or related parties (the "AHI Claims").

Additionally, if **but only if** the Sale Proceeds are insufficient to pay all Allowed Claims in full, the Debtor identifies, and reserves the right to pursue, any and all claims that it has or may have against Crestwood Hospitality, LLC, Khangura Development, LLC, Santa Fe Hospitality, LLC, Sukhbinder Khangura, Rupi Khangura and Jasbhinder Khangura and any of their affiliated entities (collectively, the "Related Entity Claims"). If **but only if** the Sale Proceeds are insufficient to pay all Allowed Claims in full, then within 30 days of the consummation of the Sale, the Reorganized Debtor will, in consultation with the United States Trustee's Office, retain appropriate counsel (which shall not be Sacks Tierney P.A. or any other counsel previously retained by the Debtor or the Debtor's principals or affiliates) (the "Litigation Agent") to analyze and, if appropriate, pursue and/or settle any Related Entity Claims in the Litigation Agent's discretion.

Any recovery from any retained causes of action, including any AHI Claims and/or Related Entity Claims, after payment of the Litigation Agent fees and costs and all costs and expenses of collection (collectively, the "Litigation Proceeds") shall be distributed pursuant to the terms of the Plan.

## XX. EXCULPATION AND LIMITATION OF LIABILITY

Neither the Debtor nor any of its members, officers, directors, managers, employees, advisors, attorneys, accountants, affiliates, representatives or agents, including Ledgestone (the "Exculpated Parties" and each, an "Exculpated Party") shall have or incur any liability to any holder of a Claim or Interest, or to any other Person or entity, for any post-petition act or omission in connection with, relating to, or arising out of, the Debtor' Bankruptcy Cases or any adversary proceeding or contested matter commenced therein, the formulation, negotiation, implementation, confirmation or consummation of the Plan, or any contract, instrument, release or other agreement or document entered into during the Bankruptcy Case or otherwise created in connection with the Plan, the administration of the Plan or the property to be distributed under the Plan; provided, however, that nothing in this Section shall be construed to release or exculpate any Exculpated Party from willful misconduct, fraud or gross negligence as determined by a Final Order of the Bankruptcy Court.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

## XXI. EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Except as otherwise provided herein, and unless rejected or assumed by a separate order of the Court prior to the Confirmation Date, the Debtor hereby assumes the SRE PSA, the Endeavors Contract, the Ledgestone Management Agreement, and all unexpired leases and executory contract listed in Schedule "G" of the Debtor's Schedules, as of the Confirmation Date. All assumed contracts and executory contracts, except the Vehicle Leases, the SRE PSA and the Ledgestone Management Agreement, shall be assigned to SRE upon its consummation of the Sale or to the Prevailing Bidder upon its consummation of the Sale following the Auction.

Proofs of Claim under § 502(g) arising as a result of the rejection of executory contracts or unexpired leases by the Plan shall be filed no later than 30 days after the Confirmation Date. Any such Claims not timely filed and served shall be disallowed.

## XXII. REVESTING

Except as provided for in the Plan or in the Confirmation Order, on the Confirmation Date the Reorganized Debtor shall be vested with all property of the Debtor's Estate free and clear of all liens, claims, charges, and other interests of Creditors arising prior to the Confirmation Date.

## XXIII. DEFAULT.

If the Reorganized Debtor fails to perform the terms and conditions of this Plan, then any Creditor may seek to enforce the Plan. Before doing so, however, a Creditor must first provide at least 30 days' notice to the Reorganized Debtor specifying the nature of the alleged default and providing the Reorganized Debtor a 30-day period to cure such default. Any such notice shall be in writing and sent to the Debtor by certified mail at the address on file with the Clerk of the Court with a copy by certified mail to:

Philip R. Rudd
Randy Nussbaum
Sierra Minder
Sacks Tierney, P.A.
4250 N. Drinkwater Blvd., Fourth Floor
Scottsdale, Arizona 85251

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

3120052.v1

# XXIV. MISCELLANEOUS PLAN PROVISIONS

A. **General Injunction.** Except as otherwise expressly provided in the Plan, the Confirmation Order shall provide, among other things, that all parties in interest who have, hold, or may hold Claims are permanently enjoined on and after the Confirmation Date from: (a) commencing or continuing in any manner any action or other proceeding of any kind with respect to any such claim against the Debtor or any successor in interest of the Debtor, against property of the Debtor, or against property of any successor-in-interest of the Debtor, the enforcement, attachment, collection, or recovery by any person or means of any judgment, award, decree, or against the Debtor or any success in interest of the Debtor, property of the Debtor, or against the property of any successor-in-interests of the Debtor with respect to any such Claim; (b) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or any success in interest of the Debtor, against property of the Debtor, or against property of any successor in interest of the Debtor with respect to any such claim; (c) from asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Debtor or any successor in interest of the Debtor, against property of the Debtor, or against property of any successor in interest of the Debtor, with respect to any such claim; (d) conducting any form of discovery from the Debtor with respect to any such Claim, or any successor in interest of the Debtor; and/or (e) harassing the Debtor or any successor-in-interest of the Debtor.

B. **Vesting.** The Reorganized Debtor shall be revested with ownership of and dominion over any other property and assets of the Estate upon the Confirmation of this Plan. All assets vested in the Reorganized Debtor shall be free and clear of all liens, claims, and interest of creditors and parties in interest except as specifically provided in the Plan.

C. **Severability.** Wherever possible, each provision of this Plan shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Plan shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Plan. Furthermore, if the

3120052.v1

Bankruptcy Court will not confirm this Plan because one or more provisions hereof are determined to be prohibited or invalid under applicable law, the Reorganized Debtor may seek permission of the Bankruptcy Court to amend this Plan by deleting the offending provision.

D.     Revocation of Plan. The Debtor reserve the right to revoke and/or withdraw this Plan prior to entry of the Confirmation Order. If the Debtor revoke and/or withdraw this Plan, or if confirmation of this Plan does not occur, then this Plan shall be deemed null and void and nothing contained herein shall be deemed to constitute a waiver or release of any Claims by or against the Debtor or any other person or entity or to prejudice in any manner the rights of the Debtor, or any person or entity in any further proceeding involving the Debtor.

E.     Retention of Causes of Action: The Reorganized Debtor shall retain all claims or causes of action that it has as of the Confirmation Date, the powers of the debtor in possession for purposes of prosecuting claims and causes of action arising under the Bankruptcy Code, and full authority to pursue, compromise, and resolve all such claims and causes of action unless the Court has granted any such right to a creditor of this estate.

F.     Appeal:  In the event of an appeal of the Confirmation Order or any other kind of review or challenge to the Confirmation Order, and provided that no stay of the effectiveness of the Confirmation Order has been entered, the Bankruptcy Court will retain jurisdiction to implement and enforce the Confirmation Order and the Plan according to their terms, including, but not limited to, jurisdiction to enter such orders regarding the Plan or the performance thereof as may be necessary to effectuate the reorganization of the Debtor.

G.     Effectuating Documents and Further Transactions: The Debtor and the Reorganized Debtor will be authorized under the Plan to execute, deliver, file, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan, the Plan Documents and any securities issued pursuant to

3120052.v1

the Plan.

H.    Release of Liens: Except as otherwise specifically provided in or contemplated by the Plan, or in any contract, instrument or other agreement or document created in connection with the Plan, each holder of: (i) any Secured Tax Claim; (ii) any Claim that is purportedly secured; and/or (iii) any judgment, personal property or ad valorem tax, mechanics' or similar lien Claim, in each case regardless of whether such Claim is an Allowed Claim, will, on or immediately before the Confirmation Date and regardless of whether such Claim has been scheduled or a Proof of Claim with respect to such Claim has been filed, (x) turn over and release to the Estate or the Reorganized Debtor, as the case may be, any and all property of the Debtor or the Estate that secures or purportedly secures such Claim, or such lien and/or Claim will automatically, and without further action by the Reorganized Debtor, the Estate or the Reorganized Debtor, be deemed released and (y) execute such documents and instruments as the Reorganized Debtor requires to evidence such Claim holder's release of such property or lien, and if such holder refuses to execute appropriate documents or instruments, the Debtor, the Estate, or the Reorganized Debtor (as applicable) may, in its discretion, file a copy of the Confirmation Order in the appropriate recording office, which will serve to release any Claim holder's rights in such property. Further, except as otherwise specifically provided in or contemplated by the Plan, or in any contract, instrument or other agreement or document created in connection with the Plan, on the Confirmation Date, all right, title and interest in such property will revert or be transferred to the Reorganized Debtor free and clear of all Claims and interests, including, without limitation, lines, escrows, charges, pledges, encumbrances, and/or security interests of any kind.

I.    Governing Law:  Except to the extent that the Bankruptcy Code or other federal law is applicable, the rights, duties, and obligations arising under the Plan will be governed by, and construed and enforced in accordance with, the laws of the State of Arizona, without giving effect to any contrary result otherwise required under applicable choice or conflict of law rules.

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251–3693

J.      Binding Effect: The Plan will be binding upon and inure to the benefit of the Debtor, the holders of Claims and Interests, and their respective successors and assigns, including, without limitation, the Reorganized Debtor.

K.      Headings: The headings of the articles, paragraphs, and sections of the Plan are inserted for convenience only and will not determine the interpretation of the substantive provisions of the Plan.

## XXV. LIQUIDATION ANALYSIS

The Debtor's Plan provides for the liquidation of the Debtor's Property and the payment of all Allowed Claims in full, as well as a significant distribution to holders of Allowed Interests. If the Plan is not confirmed and the case is converted to Chapter 7 of the Bankruptcy Code instead, it is uncertain whether the Property will sell for the Purchase Price or for a lesser amount that will not allow for the payment of Allowed Claims in full. Moreover, in the event of a conversion of this case to Chapter 7, an additional layer of administrative claims will be added to the expenses of the Estate and may lessen the recovery to Creditors. Therefore, Creditors and Interest Holders stand to recover more under the Plan than through a forced liquidation.

## XXVI.      DISCLAIMER

Court approval of this Disclosure Statement and the accompanying Plan is not a certification of the accuracy of the contents thereof.  Furthermore, Court approval of this Disclosure Statement does not constitute the Court's opinion as to whether the Plan should be approved or disapproved.

## XXVII.      DEBTOR'S RECOMMENDATIONS

The Debtor recommends that all Creditors entitled to vote to accept the Plan do so. The Debtor' Plan will pay Creditors at least as much, and likely significantly more, than they will receive if the Plan is not confirmed.  The most likely alternatives to confirmation of the Plan would be conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code or dismissal, and neither of those options would serve to benefit the Debtor's creditor body as a whole. A conversion to Chapter 7 would result in a dramatically

reduced distribution to Secured and Unsecured Creditors. Dismissal of these Bankruptcy Cases would likely result in litigation, foreclosure, and execution on the Debtor's property, which would likely force the Debtor to liquidate its assets in a forced liquidation which may not result in payment in full of all Allowed Claims. For all these reasons, the Debtor urges you to vote to accept their Plan.

[signatures on following page]

3120052.v1

DATED: September 22, 2021.

**WOODBRIDGE HOSPITALITY, L.L.C.**


By: */s/ Sukhbinder Khangura (with permission)*
Name: Sukhbinder Khangura
Its:      Manager

**SACKS TIERNEY P.A.**


By: */s/ Philip R. Rudd*
    Randy Nussbaum
    Philip R. Rudd
    Sierra M. Minder
    *Attorneys for Debtor*

3120052.v1

SACKS TIERNEY P.A., ATTORNEYS
4250 NORTH DRINKWATER BOULEVARD
FOURTH FLOOR
SCOTTSDALE, ARIZONA 85251-3693